# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

JANA KEELE, individually and      \*
as administrator of the estate of      \*
Kara Thompson, deceased,      \*
     \*
     Plaintiff,      \*
     \*
     vs.      \*      CV 211-074
     \*
GLYNN COUNTY, GEORGIA,      \*
WAYNE V. BENNETT,      \*
individually and in his official capacity,      \*
JEFFREY GUNDERSON,      \*
individually and in his official capacity,      \*
JOHN ORR,      \*
individually and in his official capacity,      \*
JESSICA CARNETTE,      \*
individually and in her official capacity,      \*
GARY HOLLINGSWORTH,      \*
individually and in his official capacity,      \*
HELEN BROWN,      \*
individually and in her official capacity,      \*
     \*
     Defendants.      \*

## ORDER

Presently before the Court is Defendants' Motion for Summary Judgment.  See Dkt. No. 44.  Upon due consideration, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

1

# I.    PROCEDURAL BACKGROUND

This action is predicated on the tragic death of Plaintiff's daughter, Kara Thompson ("Thompson").  <u>See</u> Dkt. No. 1.  Specifically, Thompson succumbed to necrotizing tracheobroncitis and pneumonia while detained in the Glynn County Detention Center ("GCDC") in May 2009.  <u>See</u> <u>id.</u>

Plaintiff's general theory of liability is that, while detained, Thompson's access to necessary medical care was delayed or deficient and that the delay or deficiency led to Thompson's death.  Plaintiff's Complaint has eight (8) counts. <u>See</u> <u>id.</u>  In Counts 1, 4, 7, and 8, Plaintiff asserts federal law claims.  Specifically, Count 1 asserts claims of constitutional violations against Defendant Glynn County and the remaining Defendants in their official capacities.  Count 7 asserts claims of constitutional violations against four (4) individual Defendants in their individual capacities.  Count 4 seeks attorney's fees pursuant to 42 U.S.C. § 1988.  Count 8 seeks punitive damages for the individual Defendants' constitutional violations.

In Counts 2, 3, 5, and 6, Plaintiff asserts state law claims.  Specifically, Count 2 asserts violations of state statutes pertaining to detainee supervision and care by

Defendant Glynn County and Defendant Bennett.  Counts 3 and 6
assert tort claims against Defendants Bennett and Orr.  Count 5
asserts tort claims against Defendant Gunderson.

Defendant Gunderson moved for summary judgment on all
claims against him.  Dkt. No. 40.  Plaintiff consented to
Defendant Gunderson's motion.  Dkt. No. 52.  The Court approved
the parties' agreement.  <u>See</u> Dkt. No. 76.  Accordingly,
references to "Defendants" in the remainder of this Order refer
to the remaining Defendants.

Defendants moved for summary judgment on all of Plaintiff's
claims.  <u>See</u> Dkt. No. 44.  This motion is fully briefed.  <u>See</u>
Dkt. Nos. 53, 75.  The Court heard oral argument regarding the
motion on December 18, 2012.

## II.  FACTUAL BACKGROUND

The relevant facts are taken principally from the parties'
Statements of Material Facts and responses thereto.  Dkt. Nos.
44-1, 57, 57-1.[1]  Pursuant to Federal Rule of Civil Procedure
56(e) and Local Rule 56.1, all material facts not specifically

------------------------

[1] The Court did not credit alleged facts that were unsupported by a party's
citation to the record.

controverted by specific citation to the record are deemed
admitted, unless otherwise inappropriate.

Where the parties offer conflicting accounts of the events
in question, this Court draws all inferences and presents all
evidence in the light most favorable to Plaintiff.  See Hamilton
v. Southland Christian Sch., Inc., 680 F.3d 1316, 1318 (11th
Cir. 2012) (citation omitted).

A. GCDC

   1.  C-Pod

    The GCDC consists of six (6) housing units or "pods."  Dkt.
No. 57-1 ¶ 1.  Female inmates at the GCDC were detained in C-
Pod.  Id.  In May 2009, C-Pod housed approximately eighty-eight
(88) inmates, approximately twenty-four (24) inmates above
design capacity.  Id. ¶ 102.

   2.  Detention Officers

    GCDC detention officers worked twelve (12) hour shifts.
Id. ¶ 3.  The day shift was from 6:00 a.m. to 6:00 p.m.  Id.
The night shift was from 6:00 p.m. to 6:00 a.m.  Id.

    One officer worked in the C-Pod control station during each
shift.  Id. ¶ 1.  That officer was relieved from her duty

station to perform hourly rounds (or for any other reason) by a floater, supervisor, booking officer, or other available personnel.  Id. ¶ 5.

3.  GCDC Medical Personnel

In 2009, the GCDC's only doctor was Doctor Jeffrey Gunderson.[2]  Id. ¶ 20.  Dr. Gunderson was an independent contractor.  Dkt. No. 55-18, at 14-15.  Dr. Gunderson hired and paid one (1) physician assistant.  Id. at 15, 34-35.  Neither Dr. Gunderson nor his assistant was a GCDC employee.  Dkt. No. 57-1 ¶ 20-21.  All other GCDC medical personnel were county and sheriff's office employees.  Id. ¶ 21.  Neither the county nor the sheriff's department consulted Dr. Gunderson regarding GCDC policy or staffing needs.  Id. ¶¶ 21, 105.

Dr. Gunderson worked twenty (20) hours per week and was on call twenty-four (24) hours per day, every day.  Dkt. No. 55-18, at 14-15.  In general, his assistant performed initial evaluations and handled sick call on Thursday and Friday mornings.  Id. at 15.  In general, Dr. Gunderson handled such tasks Saturday through Wednesday.  Dkt. No. 57-1 ¶ 20.

─────────────────────

[2] The GCDC also had a mental health professional.  Dkt. No. 55-18, at 25.

Two (2) licensed practical nurses ("LPNs") worked during most, if not all, day shifts. Id. ¶ 7. Frequently, an LPN worked during night shifts. Id. Sometimes the LPN was also the GCDC "floater" during the night shift. Id. Dr. Gunderson instructed Nurse John Orr, an LPN, to notify Dr. Gunderson if Nurse Orr learned that an inmate was withdrawing from drugs. Dkt. No. 55-18, at 63.

B. Thompson's Detention

In May 2009, Thompson was seventeen (17) years old. She lived with Plaintiff. Dkt. No. 1, at 4.

While visiting Plaintiff and Thompson, Thompson's grandmother discovered that approximately $250 was missing from her purse and car. Id. She assumed that Thompson took the money. Id. To teach Thompson a lesson, Thompson's grandmother took a warrant out, alleging that Thompson took the missing money. Id.

1. Day 1: Friday, May 8, 2009

On Friday, May 8, Thompson was arrested. Id. She was booked at the GCDC. Id. During the intake process, Thompson reported that she had previously been treated for drug

addiction.  Dkt. Nos. 44-1 ¶ 7; 57 ¶ 7.  Thompson also stated

that she may have a broken rib for which she had already been

treated.  Dkt. Nos. 44-1 ¶ 8; 57 ¶ 8.

Starting Friday, Thompson ate and drank very little, if

anything, other than water.[3]  Dkt. No. 57-1 ¶ 65.  From Friday,

May 8, until Sunday, May 10, she often gave her food to other

inmates.  Dkt. No. 55-5, at 45.  Moreover, Thompson regurgitated

much, if not all, of the food that she did consume.  Dkt. No.

57-1 ¶ 65.  Thompson's minimal food consumption and vomiting

continued throughout the week.  Id. ¶¶ 65, 66.

Sometime Friday, Inmate Amber Lambert filled out and

submitted a sick call sheet for Thompson.  Dkt. No. 55-1, at 20.

The sick call sheet requested pain medication for Thompson's

sore ribs.[4]  Id.

2.  Day 2:  Saturday, May 9, 2009

On Saturday, May 9, Thompson told Detention Officer Helen

Brown that her rib hurt.  Dkt. Nos. 44-1 ¶ 9; 57 ¶ 9.  Officer

Brown notified the on-duty nurse.  Dkt. Nos. 44-1 ¶ 10; 57 ¶ 10.

_____

[3] Many inmates refused to eat upon initial entry.  Dkt. No. 55-5, at 43-44.
However, they generally began to eat after approximately three (3) days.  Id.
[4] It is unclear whether Thompson received pain medication Friday.  However,
she did receive such medication Saturday.  Dkt. Nos. 44-1 ¶ 10; 57 ¶ 10.

7

The nurse gave Thompson Ibuprofen and an ice pack to ease the discomfort. Dkt. Nos. 44-1 ¶ 10; 57 ¶ 10.

Also on May 9, Plaintiff delivered two (2) medications to the GCDC. Dkt. Nos. 44-1 ¶ 11; 57 ¶ 11. Thompson was prescribed these medications prior to her detention. Dkt. Nos. 44-1 ¶ 11; 57 ¶ 11. They were prescribed because of Thompson's rib injury. Dkt. Nos. 44-1 ¶ 11; 57 ¶ 11. During her detention, Thompson received these medications as prescribed. Dkt. Nos. 44-1 ¶ 12; 57 ¶ 12.

Officer Brown brought Thompson's lunch to her in her cell.[5] Dkt. No. 55-5, at 27.[6]

Sometime during the weekend, Thompson had "the shakes." Dkt. No. 55-10, at 11. Thompson lay around and slept for much of the weekend. Dkt. No. 55-5, at 11-13.

---

[5] This was unusual because the general procedure was that inmates must pick up their own food trays. Dkt. No. 55-5, at 45.
[6] Inmate Dinah Smith stated that Officer Brown brought lunch to Thompson a "couple" of times. Dkt. No. Id. at 27. Officer Brown only worked the day shift on Monday and Tuesday. See Dkt. No. 56-60. Consequently, the Court infers that these are the days in which Officer Brown brought Thompson her lunch.

3.   Day 3:  Sunday, May 10, 2009

Every morning at 6:30 a.m., GCDC officers inspected the inmates' cells for cleanliness.  <u>Id.</u> at 15.  Beginning Sunday, May 10, inmates made Thompson's bed and cleaned her cell because Thompson could not or would not do so.  Dkt. No. 55-8, at 39.  This continued throughout the week.  <u>Id.</u>

Officer Brown brought Thompson's lunch to her in her cell.[7]  Dkt. No. 55-5, at 27.[8]

4.   Day 4:  Monday, May 11, 2009

Sometime Monday morning, Dr. Gunderson performed Thompson's initial medical screening.[9]  Dkt. Nos. 44-1 ¶ 13; 57 ¶ 13.  Dr. Gunderson questioned Thompson about her medical history.  Dkt. Nos. 44-1 ¶ 13; 57 ¶ 13.  He did not perform a physical evaluation.  Dkt. Nos. 44-1 ¶ 13; 57 ¶ 13.  Because Thompson reported that she had not taken illicit drugs, Dr. Gunderson did not place Thompson on a drug detox protocol.  Dkt. Nos. 44-1 ¶ 14; 57 ¶ 14.

─────────────────────

[7] <u>See</u> <u>supra</u> note 5.
[8] <u>See</u> <u>supra</u> note 6.
[9] GCDC policy was to screen every detainee at least two (2) times:  the first weekday morning after her detention and fourteen (14) days after her detention.  Dkt. No. 55-18, at 17-18.

At approximately 10:30 p.m. on Monday, May 11, Thompson told Detention Officer Jessica Carnette that she had rashes over her body. Dkt. Nos. 44-1 ¶ 15; 57 ¶ 15. Officer Carnette notified Nurse Orr. Dkt. Nos. 44-1 ¶ 16; 57 ¶ 16. Nurse Orr examined Thompson. Dkt. Nos. 44-1 ¶ 16; 57 ¶ 16. He noted that Thompson had a rash and had vomited one (1) time. Dkt. Nos. 44-1 ¶ 16; 55-11, at 167; 57 ¶ 16. He also noted that Thompson complained of nausea and of her throat and chest "tightening up." Dkt. Nos. 44-1 ¶ 16; 57 ¶ 16.

Nurse Orr called Dr. Gunderson and informed him of Thompson's condition. Dkt. Nos. 44-1 ¶ 17; 57 ¶ 17. Dr. Gunderson prescribed multiple drugs, including Benadryl, Prednisone, and Cimetidine. Dkt. No. 55-11, at 168-69. Dr. Gunderson had Nurse Orr place Thompson on the sick call list so that Thompson would be seen by Dr. Gunderson the following day. Dkt. Nos. 44-1 ¶ 19; 57 ¶ 19.

Sometime Monday, Inmate Dinah Smith began telling officers that she believed that Thompson was withdrawing from drugs. Dkt. No. 55-5, at 39. Inmate Smith relayed this concern to

Officer Carnette and Nurse Orr at 6:00 p.m.[10]  See id.; Dkt. No.

56-60.  During the week, Inmate Smith also relayed this concern

to Officer Harris, Officer Brown, and Master Sergeant James

Jones.  Dkt. No. 55-5, at 39.

Starting Monday, Thompson did not want to get out of bed.

Dkt. No. 55-1, at 23.  She spent most of her time lying down.

Dkt. No. 55-6, at 12.

5.  Day 5:  Tuesday, May 12, 2009

At 9:30 a.m. on Tuesday, May 12, Dr. Gunderson evaluated

Thompson to follow-up on the prior night's phone-based medical

orders.[11]  Dkt. Nos. 44-1 ¶ 20; 55-18, at 81; 57 ¶ 20.

Dr. Gunderson noted that Thompson had a rash and complained of

nausea.  Dkt. Nos. 44-1 ¶ 21; 57 ¶ 21.  Dr. Gunderson adjusted

--------

[10] Officer Carnette and Nurse Orr began their shifts at 6:00 p.m.  Dkt. No.
56-60, at 8.  Interpreting the facts in Plaintiff's favor, Inmate Smith
immediately told Officer Carnette and Nurse Orr that she suspected that
Thompson was withdrawing from drugs.
[11] Plaintiff objects to the use of the word "evaluated."  Specifically,
Plaintiff asserts that Dr. Gunderson did not "physically examine[]" Thompson.
Dkt. No. 57 ¶ 20.  However, the portions of the record cited by Plaintiff do
not support this assertion.  Specifically, Dr. Gunderson did not say that he
only spoke with Thompson.  Moreover, the only reasonable inference supported
by the record is that Dr. Gunderson viewed Thompson's rash so that he could
properly determine the course of treatment.  See Dkt. Nos. 44-1 ¶ 21 (citing
Dkt. No. 1, at 5-6); 57 ¶ 21.  Thus, Dr. Gunderson "evaluated" Thompson's
physical condition.  See Dkt. NO. 1 ¶ 17 (noting that Dr. Gunderson
"examined" Thompson).

the prescribed medications.  Dkt. No. 57 ¶ 20, 22.  He also
prescribed a medication for Thompson's nausea.  Dkt. Nos. 44-1
¶ 22; 57 ¶ 22.  Dr. Gunderson noted that Thompson was happy,
laughing, and in no distress.  Dkt. No. 55-18, at 81.

Sometime Tuesday,[12] Officer Daphine Parker told Thompson
that Thompson was not taking care of herself, showering, or
cleaning her area.  Dkt. Nos. 55-5, at 24; 55-6, at 13-14.
Officer Parker told Thompson that she was "nasty" for not doing
so.  Dkt. Nos. 55-5, at 24; 55-6, at 13-14.

6.  Day 6:  Wednesday, May 13, 2009

At 6:00 a.m. on Wednesday, May 13, Thompson complained
about her rashes.  Dkt. No. 56-57, at 25.  At approximately
6:30 a.m., GCDC medical personnel provided Thompson with
medications for the rash.  Id.  Medical personnel also
prescribed a cotton blanket, rather than the standard-issue wool
blanket.  Id.

At 7:00 a.m., Thompson refused breakfast.  Id.

───────────────────────

[12] Officer Parker made her comments "before Friday."  Dkt. No. 55-6, at 14.
Officer Parker worked Monday, Tuesday, and Friday.  Dkt. No. 56-60.  Viewing
the facts in Plaintiff's favor, the Court infers that Officer Parker made her
comment after Dr. Gunderson's evaluation of Thompson on Tuesday.

Sometime Wednesday,[13] Thompson had chills. Dkt. No. 55-8, at 22. Sometime Wednesday, Thompson urinated on herself. Dkt. No. 55-5, at 24-25; see also Dkt. No. 55-10, at 13-14 (referencing a weekday before Friday, May 15). Noticing this, some inmates bathed Thompson. Dkt. No. 55-10, at 13-14.

Sometime Wednesday, Thompson began hallucinating. Dkt. No. 55-8, at 22. Thompson's hallucinations continued throughout the week.

Sometime Wednesday,[14] several inmates informed an officer in the C-Pod control station that Thompson was very sick and needed medical help. Id. at 23-24.

7. Day 7: Thursday, May 14, 2009

On Thursday, May 14, Thompson refused breakfast. Dkt. No. 56-57, at 25. Sometime Thursday,[15] Thompson had chills. Dkt. No. 55-8, at 22. Inmate Smith observed that Thompson felt clammy, warm, and sweaty. Dkt. No. 55-5, at 29. Inmate Smith

_____

[13] The record does not establish if Thompson's chills occurred Wednesday or Thursday. See Dkt. No. 55-8, at 22. Viewing the facts in Plaintiff's favor, the Court infers that Thompson's had chills both days.
[14] The record does not establish if this occurred Wednesday or Thursday. See id. at 23-24. Viewing the facts in Plaintiff's favor, the Court infers that GCDC personnel were notified of Thompson's symptoms as early in the week as possible.
[15] See supra note 13.

also observed that Thompson was pale and had visible blisters on the inside of her mouth.  Id.

Sometime Thursday, Inmate Lambert filled out and submitted a sick call sheet for Thompson.  Dkt. No. 55-1, at 21.  The sick call sheet stated that Thompson had diarrhea, was vomiting and wheezing, and needed medical assistance.  Id. at 22.

During the day on Thursday, Inmate Lambert pushed the call button in Thompson's cell and summoned the C-Pod officer.  Id. at 26.  Inmate Lambert told the responding officer that Thompson had not eaten or drunk anything, that she only lay around, that she needed medical assistance, and that nothing had been done for her.  Id. at 26-27.  In response, Officer Highsmith[16] and a male nurse came to Thompson's cell.  Id. at 27.  They stayed for at least ten (10) minutes.  Id. at 50.  Officer Highsmith told Thompson that she "needed to get up and try to do something with [her]self."  Id. at 28-29.  Thompson said, "I feel like I'm dying."  Id. at 29.  Officer Highsmith asked Thompson when she last ate and whether should could get up and drink some water.

_____

[16] It is unclear whether Officer Highsmith was a nurse.  See Dkt. No. 55-1, at 29-30.

14

Id. at 30.   Inmate Lambert stated that Thompson could not "hold
[any]thing down" and needed help.   Id. at 30.

At 6:00 p.m. Inmate Smith told Officer Brown that she
believed that Thompson was withdrawing from drugs.[17]   See Dkt.
Nos. 55-5, at 39; 56-60.

At approximately 8:00 p.m., Detention Officer Brown
observed Thompson wearing only a shirt and underwear.   Dkt. Nos.
44-1 ¶ 23; 55-17, at 30-31; 57 ¶ 23.   Officer Brown told
Thompson to cover herself.   Dkt. Nos. 44-1 ¶ 24; 57 ¶ 24.
Thompson said that she was hot and asked for a fan.   Dkt. Nos.
44-1 ¶ 24; 57 ¶ 24.   Officer Brown stated that Thompson could
not have a fan.   Dkt. Nos. 44-1 ¶ 25; 57 ¶ 25.   Officer Brown
also told Thompson that she at least needed to cover herself
with a sheet.   Dkt. Nos. 44-1 ¶ 25; 57 ¶ 25.

At approximately 9:00 p.m., Officer Brown observed that
Thompson had not covered herself.   Dkt. No. 44-1 ¶ 26.   When
asked, Thompson stated that she was uncovered because she was
hot.   Dkt. No. 55-17, at 31-32.   More specifically, Thompson

─────────────────────────

[17] Inmate Smith began telling GCDC personnel that she suspected that Thompson
was withdrawing from drugs on Monday.   However, Officer Brown did not work
from 6:00 p.m. Sunday until 6:00 p.m. Thursday.   Dkt. No. 56-60.
Interpreting the facts in Plaintiff's favor, Inmate Smith told Officer Brown
that she suspected that Thompson was withdrawing from drugs when Officer
Brown began her shift at 6:00 p.m. Thursday.

stated that she felt like she was having a heat stroke.  Dkt.
No. 56-27.  Officer Brown also observed feces stains on
Thompson's underwear.[18]  Id.  Because Thompson remained
uncovered, Officer Brown placed Thompson on twenty-four (24)
hour cell restriction[19] for insubordination.[20]  Dkt. No. 44-1
¶ 27.

During each hourly check from 6:00 p.m. Thursday until 6:00
a.m. Friday, Officer Brown found Thompson lying in her bed.
Dkt. No. 55-17, at 43.

––––––––––––––––––––––

[18] In her deposition, Officer Brown stated that she observed menstrual cycle
spotting, not feces stains, on Thompson's underwear.  Dkt. No. 55-17, at 38-
41.
[19] Cell restriction is a punishment wherein inmates remain isolated in their
cell with the cell door locked for the specified time period.  Dkt. No. 57-1
¶ 45.
[20] Plaintiff asserts that Thompson was subsequently placed on an additional
twenty-four (24) hour cell restriction for insubordination.  Id. ¶ 56 (citing
Dkt. Nos. 55-2, at 37-38; 55-4, at 13-16; 56-61).  However, the record does
not support this assertion.  As a preliminary matter, the Court notes
Plaintiff's acknowledgement that the date "5/15/2009  5/15/2009" on the "Jail
Notes" (Dkt. No. 56-61) was a scrivener's error which should properly read
"5/14/2009  5/15/2009."  See, e.g., Dkt. No. 55-4, at 14.  With that
correction in mind, the "Jail Notes" state that Thompson received a cell
restriction from 9:00 p.m. Thursday until 9:00 p.m. Friday.  See Dkt. No. 56-
61, at 1.  Those notes then contain an entry by Officer Parker.  Id.  Officer
Parker's note simply states that Thompson was warned several times about
being naked in her room and that no permission was made to move Thompson to a
cell with a door that contained a closable flap.  Id.  Officer Parker's note
does not indicate that Thompson's cell restriction was extended.  Id.  In
fact, Officer Parker's note does not reference cell restriction in any way.
Id.  Without factual evidence allowing the Court to infer that Thompson's
cell restriction was extended, the Court cannot do so.

16

Starting Thursday, Thompson did not leave her cell (other than in the instances described below). Dkt. No. 55-1, at 39. She spent most of her time lying down. Dkt. No. 55-6, at 12.

8. Day 8: Friday, May 15, 2009

a. Night Shift

At approximately 6:00 a.m. on Friday, May 15, Officer Brown conducted her hourly rounds. After reaching Thompson's cell, Officer Brown noticed that Thompson had soiled herself. Dkt. No. 55-5, at 16. Officer Brown backed away. Id. She then ridiculed Thompson for not showering or cleaning herself. Id. at 16-17. Officer Brown stated, "Just because you women come to jail doesn't mean you have to stop being women; you can still take care of yourself." Id.

b. Day Shift

Officer Parker was the C-Pod officer from 6:00 a.m. until 6:00 p.m. on Friday, May 15. During the shift change, Officer Brown relayed to Officer Parker that Thompson was on cell restriction for insubordination related to being unclothed. Dkt. No. 55-4, at 13-14.

During her first hourly round, Officer Parker spoke with Thompson. Specifically, she discussed Thompson's earlier insubordination with regards to being unclothed. Id. at 20-21. She also asked Thompson if she was "okay." Id. Thompson acknowledged that she was okay. Id. Officer Parker noted that it was early in the morning and Thompson was sleepy and groggy. Id. at 21.

On her second hourly round, Officer Parker aroused Thompson from sleep to ensure that she was conscious and alert. Id. at 26. Officer Parker asked Thompson if she felt better and let Thompson know that she was there if Thompson needed anything. Id. Thompson stated that she did not feel better. Id. at 26-27. Officer Parker checked on Thompson during each subsequent hourly round. Id. at 25. Each time, Thompson was in her bed, and Officer Parker had similar interactions with Thompson. Id. at 25, 27. At some point, Officer Parker observed Thompson walking around. Id. at 19.

Someone ate half of Thompson's lunch. Id. at 27. It is unknown whether Thompson or her roommate, Inmate Patricia Dixon, consumed the meal. Id. at 27-28.

Around lunchtime, Thompson smelled very bad.  Dkt. No. 55-10, at 18-19.  She vomited on her sheets.  Id. at 19.  Her skin was yellow.  Id.  She was hallucinating.  Id.

Sometime Friday, Thompson complained to Inmate Chandler Lloyd that her rib hurt.  Id. at 16.

Multiple times throughout the day, Thompson and her roommate, Inmate Dixon, notified Officer Parker that Thompson did not feel well.  Dkt. No. 57-1 ¶ 48.  Officer Parker checked on Thompson after each request.  Dkt. Nos. 55-4, at 24-25; 57-1 ¶ 48.  Officer Parker also called GCDC medical staff multiple times during the day to report that Thompson did not feel well, was not eating, and was lying down.[21]  Dkt. No. 55-4, at 35; 57-1 ¶ 48.  Thompson saw medical personnel at least two (2) times during Officer Parker's shift.[22]  Dkt. No. 55-4, at 42.

Before dinner, at approximately 5:00 or 6:00 p.m., Inmate Morgan Medlin found Thompson in her cell covered in feces, urine, and vomit.  Dkt. No. 55-6, at 16-17.  Thompson walked to

---

[21] Parker also contacted GCDC mental health personnel regarding Thompson being "nude" in her cell.  Dkt. Nos. 56-57, at 25; 57-1 48.

[22] Thompson's medical records do not contain notes related to any medical evaluations between Tuesday, May 12, and Friday, May 15, at 7:00 p.m.  See Dkt. No. 56-68.

the bathroom, where some inmates undressed and bathed her.[23]
Dkt. Nos. 55-5, at 18; 55-6, at 16, 25.  Other inmates cleaned
Thompson's room.  Dkt. No. 55-6, at 25.

Before dinner, Officer Parker noted that Thompson appeared
"more alert."  Dkt. No. 55-4, at 29.  Consequently, Officer
Parker made Thompson come out of her room to get her dinner
tray.  Id.  Thompson sat down in the open area to eat.  Id.
Officer Parker saw Thompson take bites of her meal; however,
Inmate Smith observed that Thompson ate almost nothing.  Id. at
29-30; Dkt. No. 55-5, at 26.  Inmate Smith notified an unknown
officer that Thompson had not eaten all week.  Dkt. No. 55-5, at
26.

c. Night Shift

While Thompson had dinner, Officer Parker's shift ended.
Dkt. No. 55-4, at 29-30.  At 6:00 p.m., Officer Carnette, Master
Sergeant Jones, and Nurse Orr's shifts began.  Dkt. Nos. 55-3,
at 9; 55-4, at 29-30; 55-12, at 182.

─────────────────────

[23] The facts indicate that Thompson's cell restriction was lifted early, as it
was scheduled to expire at 9:00 p.m.  See supra note 20.

After Officer Carnette's shift began, inmates told her that
Thompson needed medical attention because she had been soiling
herself.  Dkt. No. 55-5, at 48.  Officer Carnette notified
medical personnel.  Id.  Officer Carnette stated that all that
she could do was notify medical personnel.  Id. at 48-49.

At approximately 6:30 p.m., Thompson was vomiting and dry
heaving.  Dkt. No. 55-8, at 27-28.

At approximately 6:30 p.m., Nurse Orr was delivering
medications in the C-Pod.  Id. at 27.  Several inmates told
Nurse Orr that Thompson was hallucinating, breaking out in
hives, vomiting, pale, and in need of medical care.  Id. at 48-
49.  Nurse Orr yelled, "[Thompson's] putting on the greatest
show[] for y'all in the world.  She's one of the best actors.
Nothing is wrong with this girl."  Id. at 26.

At 7:00 p.m., Thompson walked to Nurse Orr's medication
cart and received her medication.  Dkt. No. 56-18.  Nurse Orr
noted in Thompson's medical record that Thompson walked to the
medication cart unassisted and without difficulty.  Dkt. No. 56-
68, at 3.  Nurse Orr also noted that Thompson was awake and
alert.  Id.

At approximately 7:00 p.m., Inmate Smith told Nurse Orr
that Thompson needed "help" because she had not eaten all week,

was not drinking, and was not getting up or doing any activity. Dkt. No. 55-5, at 31-32. Inmate Smith also told Nurse Orr that she had showered Thompson that night. Id. at 32. Nurse Orr told Inmate Smith that she was not a doctor and that she should let him do his job. Id.

Sometime Friday evening, an inmate told Officer Carnette that Thompson vomited. Dkt. No. 55-16, at 71. Officer Carnette notified Nurse Orr. Id. at 72. Officer Carnette told the inmate that if Thompson threw up again, Officer Carnette needed to see it. Id.

Inmates continued to tell Officer Carnette that Thompson needed medical attention. Dkt. No. 55-3, at 9-10. Around 7:00 p.m., Officer Carnette told Master Sergeant Jones about the inmates' complaints. Id. Master Sergeant Jones came to C-Pod. Id. at 10. He observed Thompson sitting at a table in C-Pod watching television. Id. at 13-14. He called Nurse Orr to report the inmates' request that Thompson receive medical care. Id. at 11. Some inmates pushed on the officer station glass where Officer Carnette and Master Sergeant Jones were stationed until Master Sergeant Jones assured them that medical staff was on its way to see Thompson. Id. Officer Carnette stated that all that she could do was call the medical staff, and that it

was out of her hands after that. Dkt. No. 55-5, at 22. Master Sergeant Jones left C-Pod when Nurse Orr arrived. Dkt. No. 55-3, at 13.

Sometime Friday night,[24] Inmate Smith told Master Sergeant Jones that Thompson needed help because she had not eaten all week, was hallucinating, was weak, and could not get up and shower. Dkt. No. 55-5, at 18, 21. Inmate Smith also told Master Sergeant Jones that she assumed that Thompson was withdrawing from drugs. Id. at 21. Master Sergeant Jones commented generally that inmates broke laws, were addicts, and needed to learn how to deal with the consequences of their actions. Id. at 18, 20. He specifically told Inmate Smith that she was an inmate and addict, that she was not a doctor, and that she needed to mind her own business. Id. at 20.

At approximately 7:30 p.m., Thompson urinated on herself. Dkt. Nos. 55-5, at 46; 56-18, at 1 (referencing Thompson and Inmate Lloyd walking to showers).

_____

[24] Although the record is unclear, this conversation presumably occurred when Master Sergeant Jones was in C-Pod at approximately 7:00 p.m. See Dkt. No. 55-3, at 9-10.

Between 7:30 and 11:00 p.m., Thompson's condition deteriorated. Dkt. No. 55-5, at 19. She had hot and cold sweats. Id. She "hollered" when inmates touched her. Id.

At approximately 8:30 p.m., Officer Carnette notified Nurse Orr that Thompson was vomiting and complained of feeling bad. Dkt. Nos. 55-12, at 184; 57 ¶ 28. At 8:45 p.m., Nurse Orr and Officer Carnette entered Thompson's cell. Dkt. No. 56-18, at 3. Nurse Orr and Officer Carnette exited the cell a few minutes later. Id. They returned to the cell at 9:10 p.m. Id. During one of these visits, Nurse Orr assessed Thompson. Nurse Orr did not recall if Thompson remained supine during his assessment.[25] See Dkt. No. 55-11, at 187-88. Nurse Orr questioned Thompson about her complaints. Thompson said that she was nauseous, vomited, felt bad, and was withdrawing from Oxycontin. Dkt. Nos. 55-12, at 184; 56-68, at 3. Nurse Orr checked Thompson's blood pressure and pulse. Dkt. No. 56-68, at 3. These vital signs were within the normal range. Dkt. No. 55-12, at 189. Nurse Orr noted in Thompson's medical chart that he saw no signs or symptoms of distress and that Thompson was awake and alert.

_____

[25] Normally, Nurse Orr makes inmates stand during his assessments. Dkt. No. 55-11, at 187.

Id. at 187-89; Dkt. No. 56-68, at 3.  Nurse Orr also noted in the chart that Thompson should follow-up with the doctor the following morning.  Dkt. Nos. 55-12, at 192-93; 56-68, at 3.

Just prior to lockdown at 11:00 p.m., Officer Carnette noted that Thompson was in her cell speaking with several inmates.  Dkt. No. 57-1 ¶ 57.  The inmates left Thompson's room at lockdown.

After lockdown, Inmate Medlin heard Thompson crying, asking for help, and asking for her boyfriend.  Dkt. No. 55-6, at 24. Inmate Lloyd heard Thompson making mumbling sounds and apologizing to her grandmother and mother.  Dkt. No. 55-10, at 27.

9.  Day 9:  Saturday, May 16, 2009

a. Events Leading up to Thompson's Death

At approximately 1:30 a.m. on Saturday, May 16, Officer Carnette conducted her hourly rounds.  Dkt. No. 57-1 ¶ 58.  She saw Thompson lying in bed.  Dkt. No. 55-16, at 83.

Shortly after 2:00 a.m., Thompson moved from her bed and lay next to Inmate Dixon on Inmate Dixon's mattress.[26] Inmate Dixon banged on the cell door to get the officers' attention. Dkt. No. 57-1 ¶ 59.

After being relieved at her station, Officer Carnette responded to Inmate Dixon's call. See Dkt. No. 56-18, at 4. Officer Carnette instructed Thompson to return to her bed. Dkt. No. 57-1 ¶ 59. Thompson responded that she could not move. Id. Officer Carnette asked Inmate Dixon if Thompson fell. Id. Inmate Dixon stated that Thompson had not fallen. Id. Officer Carnette again instructed Thompson to return to her bed. Id. Thompson again responded that she could not move. Id.

Inmate Dixon told Officer Carnette that Thompson was hallucinating. Dkt. No. 55-4, at 73. Officer Carnette observed that Thompson did not appear to be in distress, that her speech was not slurred, and that she spoke normally. Id. at 68, 70. Officer Carnette also noted that Thompson made "cooing" noises. Id. at 74.

---

[26] Inmate Dixon slept on the mattress on the cell floor because she had recently had a baby. See Dkt. No. 55-4, at 72-73.

Officer Carnette summoned Sergeant Gary Hollingsworth. Dkt. No. 57-1 ¶ 59. As he entered C-Pod, Sergeant Hollingsworth said to C-pod in general, "What kind of show is [Thompson] putting on for you guys tonight?" Dkt. No. 55-10, at 28.

Officer Carnette told Sergeant Hollingsworth that she was concerned about how to handle Thompson crawling into Inmate Dixon's bed. Dkt. No. 57-1 ¶¶ 59, 61. Officer Carnette and Sergeant Hollingsworth went to Thompson's cell. Id. ¶ 59. Thompson remained on Inmate Dixon's mattress on the floor with her forehead under the lower bunk. Id. Sergeant Hollingsworth tried to talk to Thompson three (3) times. Thompson did not respond. Id. ¶ 61. She appeared to be sleeping. Dkt. No. 55-2, at 51. In an attempt to goad Thompson into responding, Sergeant Hollingsworth talked about Thompson to Officer Carnette. Dkt. No. 57-1 ¶ 61. Thompson did not respond. Id.

Sergeant Hollingsworth touched Thompson between her face and neck, thought that he felt a pulse, and noted that she did not feel cold. Id. Sergeant Hollingsworth heard Thompson breathing. Dkt. No. 55-2, at 53. He described it as "nice and smooth." Id. He also noted that Thompson snored. Id. at 52-53.

During Officer Carnette and Sergeant Hollingsworth's visit to Thompson's cell, Inmate Dixon asked to be moved. Dkt. No. 57-1 ¶ 59. To prevent a fight, the officers removed Inmate Dixon from the cell. Dkt. Nos. 55-4, at 85-86; 57-1 ¶ 62.

Inmate Medlin asked Sergeant Hollingsworth if Inmate Medlin should sleep with Thompson so that Thompson was not left alone. Dkt. No. 55-6, at 20. Sergeant Hollingsworth said that there was "nothing wrong with [Thompson]" and that "she was putting on a good show." Id. at 20-21.

At approximately 2:20 a.m., the officers closed Thompson's cell door. Dkt. Nos. 55-2, at 52, 54; 56-18, at 4. Sergeant Hollingsworth heard a louder response from Thompson as the door closed. Dkt. No. 55-2, at 52, 54. Inmate Lloyd heard a guzzle-like sound when the door closed. Dkt. No. 55-10, at 30. That was the last sound that Inmate Lloyd heard from Thompson. Id. Officer Carnette and Sergeant Hollingsworth notified Nurse Orr about Thompson's condition, including her hallucinations, assertions that she could not move, and her cooing noises. Dkt. No. 55-16, at 77-78. Sergeant Hollingsworth instructed Officer Carnette to check on Thompson in a "few minutes." Dkt. No. 55-2, at 52.

Inmate Medlin last heard a sound from Thompson approximately thirty (30) minutes after Inmate Dixon was removed from Thompson's room.  Dkt. No. 55-6, at 24.

At approximately 2:45 a.m., Officer Carnette conducted her hourly rounds.  Dkt. No. 56-18, at 4.  She looked through Thompson's cell door window and noticed that Thompson remained on the mattress on the floor.  Dkt. No. 55-16, at 85.  Officer Carnette opened the door and called out Thompson's name.  Dkt. No. 57-1 ¶ 63.  Thompson did not reply.  Id.  Officer Carnette banged her keys on the desk in Thompson's room.  Id.  Thompson did not respond.  Id.  Officer Carnette left the cell.  Id.  She summoned Sergeant Hollingsworth and Nurse Orr.  Id.

At approximately 2:50 a.m., Officer Carnette and Sergeant Hollingsworth returned to Thompson's cell.  Dkt. No. 55-16, at 88.  Sergeant Hollingsworth did not find a pulse in Thompson's neck.  Dkt. No. 55-2, at 56.  He noticed that she was cold and pale.  Id.  Thompson was not breathing.  Id.

Nurse Orr entered Thompson's cell shortly after Officer Carnette and Sergeant Hollingsworth.  Dkt. No. 56-18.  Thompson was nonresponsive and unconscious.  Dkt. No. 57-1 ¶ 64.  Nurse Orr and Officer Carnette said, "This isn't funny."  Dkt. No. 55-6, at 21.

Nurse Orr attempted to arouse Thompson by placing an ammonia strip under Thompson's nose. Dkt. No. 57-1 ¶ 64. Thompson did not respond. Id. Nurse Orr found no pulse. Id. The officers moved Thompson to the hallway——where there was more room——and commenced CPR. Id.; Dkt. No. 55-16, at 91.

The officers told GCDC personnel to summon EMS. Dkt. No. 56-68, at 4. EMTs arrived and continued administering CPR. Dkt. No. 56-18, at 4. Thompson exhibited no signs of life. Dkt. No. 57-1 ¶ 64.

### b. Events After Thompson's Death

At approximately 7:30 a.m., Undersheriff Ron Corbitt, Captain Alston, and other officers entered and exited Thompson's cell. Dkt. No. 55-5, at 36. A few minutes later, officers entered Thompson's cell with latex gloves, paper towels, spray bottles, and trash bags. Id. at 37. They cleaned Thompson's cell in approximately ten (10) minutes. Id.

A couple of hours after Thompson's cell was cleaned, Georgia Bureau of Investigation ("GBI") agents arrived and investigated Thompson's death. Id.

10.  Inmates' Observations

Many inmates noted that Thompson's condition progressively worsened throughout her detention.  Dkt. No. 57-1 ¶ 65.  From their perspective, Thompson was obviously ill.  Id.

C. Autopsy

An autopsy showed that Thompson died from necrotizing tracheobroncitis (i.e., a dying and inflamed airway).  Dkt. No. 55-24, at 13-14, 28.  She had pneumonia in both lungs, was septic due to staphylococcus and E. Coli infections, and had a small pocket of pus in her heart muscle.  Id. at 14-15, 23.  Thompson's toxicology report indicated a positive result for hydrocodone at a subtherapeutic level.  Id. at 25.  Toxicology results also revealed the presence of Benadryl and Promethazine (at a subtherapeutic level), both of which Thompson was still taking on May 15.  Dkt. Nos. 55-11, at 220; 55-24, at 25-26.  There were no signs of external trauma.  Dkt. No. 55-24, at 14.

Dr. Gunderson's opined that Thompson's condition took several days to develop.  Dkt. No. 55-18, at 81; see also Dkt. No. 55-24, at 17 (opining that the infection took more than a few hours but less than a week to develop).

## III. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. In making this determination, the court is to view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case. Id. at 325. If the moving party discharges this burden, the

burden shifts to the nonmovant to go beyond the pleadings and
present affirmative evidence to show that a genuine issue of
fact does exist.  <u>Anderson</u>, 477 U.S. at 257.

## IV.  FEDERAL LAW CLAIMS

A. <u>Count 1:  Claims Against Defendant Glynn County</u>

In Count 1, Plaintiff brings claims against Defendant Glynn
County[27] pursuant to 42 U.S.C. § 1983.  Specifically, Plaintiff
asserts that Defendant Glynn County had a policy, practice, or
custom of deliberate indifference to detainees' serious medical
needs that led to the violation of Thompson's Fourteenth
Amendment rights.  <u>See</u> Dkt. No. 1 ¶¶ 37-49.

Defendants moved for summary judgment on Count 1.
Defendants argue that there is no municipal liability under
§ 1983 because (1) Plaintiff failed to identify a custom,
practice, policy, or act of a final policymaker that caused

---

[27] Count 1 is asserted against Glynn County and the individually-named
defendants in their official capacities.  It is undisputed that these
individually-named defendants were municipal officers, working for Glynn
County, at the time of the relevant events.  In the context of a § 1983
action, "suits against a municipal officer . . . in his official capacity and
direct suits against municipalities are functionally equivalent."  <u>Sherrod v.
Palm Beach Cnty. Sch. Dist.</u>, 237 F. App'x 423, 425 (11th Cir. 2007) (quoting
<u>Busby v. City of Orlando</u>, 931 F.2d 764, 776 (11th Cir. 1991)); <u>see also</u> <u>Snow
ex rel. Snow v. City of Citronelle, Ala.</u>, 420 F.3d 1262, 1270 (11th Cir.
2005).

Plaintiff's injury and (2) there is no evidence that any alleged policy or custom was the moving force behind the events at issue in this case.  See Dkt. No. 44-2, at 26-27.  For the reasons stated below, summary judgment as to Count 1 is **GRANTED**.

1.  Legal Standard

"A municipality may not be held liable under section 1983 on a theory of respondeat superior."  Snow ex rel. Snow v. City of Citronelle, Ala., 420 F.3d 1262, 1270-71 (11th Cir. 2005) (citing City of Canton v. Harris, 489 U.S. 378 (1989)). Therefore, even if the individual defendants violated Thompson's constitutional rights, the County is not necessarily liable.  To impose § 1983 liability on a municipal entity, a plaintiff must show: "(1) that [her] constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." Bankshot Billiards, Inc. v. City of Ocala, 634 F.3d 1340, 1349 (11th Cir. 2011) (quoting McDowell v. Brown, 392 F.2d 1283, 1289 (11th Cir. 2004)).

A policy is a "decision that is officially adopted by the municipality, or created by an official of such rank that he or

she could be said to be acting on behalf of the municipality."
Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (citing
Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir.
1997)).  Because a municipality is unlikely to maintain an
official policy that endorses a constitutional violation on its
face, a plaintiff typically must show that (1) the municipality
had a custom or practice permitting a constitutional violation
and (2) the custom or practice was the moving force behind the
constitutional violation.  Craig v. Floyd Cnty., Ga., 643 F.3d
1306, 1310 (11th Cir. 2011) (citing Grech v. Clayton Cnty., Ga.,
335 F.3d 1326, 1329 (11th Cir. 2003)).

A custom "is a practice that is so settled and permanent
that it takes on the force of law."  Cooper, 403 F.3d at 1221
(citing Sewell, 117 F.3d at 489).  It must be so "longstanding
and widespread . . . that it is deemed authorized by the
policymaking officials because they must have known about it but
failed to stop it."  Craig, 643 F.3d at 1310 (citation and
alterations omitted).  This requirement "prevents the imposition
of liability based upon an isolated incident" and "ensures that
a municipality is held liable only for those deprivations
resulting from the decisions of its duly constituted legislative
body or of those officials whose acts may fairly be said to be

those of the municipality." Id. (internal citations and punctuation omitted). An act performed pursuant to a custom "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Id. (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997)) (internal citation omitted).

A plaintiff cannot rely only on her individual treatment to establish a policy or custom, even if she is treated on multiple days by different defendants. See Goebert v. Lee Cnty. Fla., 510 F.3d 1312, 1332 (11th Cir. 2007); Craig, 643 F.3d at 1311–12 (summarizing McDowell, 392 F.3d 1283). Moreover, a "single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality." Craig, 643 F.3d at 1311.

2. Application

In Count 1, Plaintiff asserts that Glynn County had policies and/or customs of deliberate indifference to pretrial detainee's serious medical needs in contravention of their

rights under the Fourteenth Amendment.[28]  See Dkt. No. 1 at

¶¶ 37-49.  Specifically, Plaintiff avers that Glynn County's

policies were to "deny basic medical care to inmates or

detainees in the hope that the inmate[s] or detainee[s] could

survive with untreated medical conditions until they were

released from the [GCDC];" "to disregard an excessive risk to [a

detainee's] health despite" knowledge of the risk; to utilize

LPNs and "prison officials with very little, if any, medical

training and no ability to evaluate [or treat a detainee's]

condition; to provide medical care that was so "cursory" that it

amounted to "no care at all;" to delay medical care; to not take

detainees to the hospital despite knowledge of illness to avoid

paying for medical care; and to under-staff the GCDC.  Dkt. No.

1 ¶¶ 41-47.

In her response to Defendants' motion for summary judgment,

Plaintiff asserts that Sheriff Bennett's——and, thus, the

County's——policies were to consider detainees' complaints to be

──────────────────────

[28] Claims of deliberate indifference to a serious medical need of a pretrial
detainee, such as is the case here, are governed by the Fourteenth
Amendment's Due Process Clause.  Case v. Riley, 270 F. App'x 908, 910 n.2
(11th Cir. 2008).  The Eighth Amendment's Cruel and Unusual Punishment Clause
applies to claims of convicted prisoners.  Id.  "However, pretrial detainees
are afforded the same protection as prisoners, and cases analyzing deliberate
indifference claims of pretrial detainees and prisoners can be used
interchangeably."  McDaniels v. Lee, 405 F. App'x 456, 458 (11th Cir. 2010).

lies "unless there was physical evidence of their illness;" to allow detention officer to assess a detainee's medical complaint and exercise discretion as to how to act; to afford detention officers discretion as to whether a detainee's refusal to eat was cause for concern and action; to allow detention officers to place detainees on twenty-four (24) hour cell restriction without getting supervisor or disciplinary committee approval; and to budget such that the GCDC could not afford more doctors or registered nurses.  Dkt. No. 53, at 66-68.

### a. Policy

The evidence does not reveal an official County or GCDC policy that facially endorsed the violation of a detainee's constitutional rights.  Plaintiff concedes that the County's written policies were facially constitutional.  See id. at 66 (stating only that the written policies were not followed).

Plaintiff asserts that Sheriff Bennett set official county policies that were not contained in the GCDC's written materials; however, Plaintiff provided no evidence that the purported deficiencies in Thompson's case resulted from policies enacted or adopted by the County or Sheriff Bennett.  Because Plaintiff provided no evidence that unconstitutional "policies"

regarding detainees' medical care at the GCDC were officially adopted by the County or an official capable of acting on behalf of the County, the Court cannot conclude that the County had a policy that facially endorsed the violation of a detainee's constitutional rights.

b. Custom or Practice

Plaintiff has not provided evidence of another occasion when the GCDC's alleged customs or practices contributed to or exacerbated a detainee's medical condition.  Thompson's isolated, albeit tragic, incident does not provide evidence of the County or GCDC's "persistent" or "widespread" custom or practice.  See Craig, 643 F.3d at 1311 (quoting McDowell, 392 F.3d at 1290-91).  Plaintiff's proof of a custom or practice rests entirely on a "single incident of unconstitutional activity."  See id. (quoting City of Oklahoma City v. Tuttle, 471 U.S. 808, 823–24 (1985)).  This is "not sufficient to impose liability" against the County.  See id.

Plaintiff failed to present evidence that the alleged constitutional violation was done pursuant to an official policy or an unofficial custom or practice of Glynn County.  Perry v. Greene Cnty., Ga., 392 F. App'x 761, 765 (11th Cir. 2010).

39

Consequently, Defendants' request for summary judgment on Count 1 is **GRANTED**.

## B. Count 7:  Claims Against Defendants Orr, Brown, Carnette, and Hollingsworth in their Individual Capacities

In Count 7, Plaintiff brings claims against Defendants Orr, Brown, Carnette, and Hollingsworth pursuant to 42 U.S.C. § 1983. Specifically, Plaintiff asserts that these defendants were deliberately indifferent to Thompson's serious medical needs in violation of the Fourteenth Amendment.  See Dkt. No. 1 at ¶¶ 77-82.

Defendants moved for summary judgment for two (2) reasons. First, Defendants contend that they did not violate Plaintiff's Fourteenth Amendment rights.  Second, Defendants contend that they are entitled to qualified immunity.  For the reasons stated below, summary judgment as to Count 7 is **GRANTED IN PART** and **DENIED IN PART**.

### 1.   Substantive Constitutional Violation

#### a. Legal Standard

Deliberate indifference to a pretrial detainee's serious medical needs is a violation of the detainee's Fourteenth

Amendment rights.[29]  See Goebert v. Lee Cnty., 510 F.3d 1312,

1326 (11th Cir. 2007) (referring to prisoner and Eighth

Amendment).  To prove deliberate indifference, a plaintiff must

show three (3) things.  First, she must show that the detainee

had a serious medical need.  Id. (citing Bozeman v. Orum, 422

F.3d 1265, 1272 (11th Cir. 2005) (per curiam)).  This is an

objective inquiry.  Id.  Second, she must show that the

defendant acted with deliberate indifference to the detainee's

serious medical need.  Id. (citing Bozeman, 422 F.3d at 1272).

This is a subjective inquiry.  Id.  Third, the plaintiff must

show that the defendant's wrongful conduct caused the detainee's

injury.  Id. (citing Hale v. Tallapoosa Cnty., 50 F.3d 1579,

1582 (11th Cir. 1995)).

> i.  *Objectively Serious Medical Need*

First, a plaintiff must show that the detainee had an

objectively serious medical need.  "A medical need that is

serious enough to satisfy the objective component 'is one that

has been diagnosed by a physician as mandating treatment or one

that is so obvious that even a lay person would easily recognize

the necessity for a doctor's attention.'"  Id. (quoting Hill v.

_____

[29] See supra note 28.

41

DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002)).

ii.  *Acted with Deliberate Indifference*

Second, a plaintiff must show that each defendant acted with deliberate indifference to the detainee's medical need. This requires proof of three things:  "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence."[30]  Id. at 1327 (citation omitted) (alteration in original).

Subjective knowledge of the risk requires that the defendant be "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists."  Farmer

_____

[30] There was previously an intra-circuit split regarding the third prong of this test.  Some courts required "more than mere negligence;" others required "more than gross negligence."  See Granda v. Schulman, 372 F. App'x 79, 83 n.1 (11th Cir. 2010).  However, the Eleventh Circuit clarified that its "mere negligence" statements were utilized in dicta and upheld the "gross negligence standard."  Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010) ("Although we have occasionally stated, in dicta, that a claim of deliberate indifference requires proof of "more than mere negligence," McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999), our earlier holding in Cottrell, 85 F.3d at 1490, made clear that, after Farmer v. Brennan, 511 U.S. 825 (1994), a claim of deliberate indifference requires proof of more than gross negligence.").

To the extent that any intra-circuit split remains, this Court will continue to apply the "more than gross negligence" standard.  See, e.g., Loadholt v. Moore, 844 F. Supp. 2d 1274, 1280-81 (S.D. Ga. 2012) (applying "more than gross negligence" and citing Goebert); Lundy v. Moore, No. CV511-013, 2011 WL 6979273, *2 (S.D. Ga. Dec. 16, 2011) (same).

v. Brennan, 511 U.S. 825, 837 (1994). It also requires the
defendant to "draw the inference." Id. "Whether a particular
defendant has subjective knowledge of the risk of serious harm
is a question of fact 'subject to demonstration in the usual
ways, including inference from circumstantial evidence.'"
Goebert, 510 F.3d at 1327 (quoting Farmer, 511 U.S. at 842).
Moreover, "a factfinder may conclude that a prison official knew
of a substantial risk from the very fact that the risk was
obvious." Id. (quoting Farmer, 511 U.S. at 842). Crucially,
the inquiry does not focus on serious medical needs "that [a
defendant] should have perceived but did not." Presley v. City
of Blackshear, 650 F. Supp. 2d 1307, 1315 (S.D. Ga. 2008),
aff'd, 340 F. App'x 567 (11th Cir. 2009) (citing Burnette v.
Taylor, 533 F.3d 1325 (11th Cir. 2008)) (emphasis added).
Rather, the official must have actually perceived the medical
need. See id. Finally, "imputed or collective knowledge cannot
serve as the basis for a claim of deliberate indifference. Each
individual Defendant must be judged separately and on the basis
of what that person kn[ew]." Id. (quoting Burnette, 533 F.3d at
1331).

After showing the defendant's subjective awareness of the
substantial risk of harm, the plaintiff must show that the

defendant "disregard[ed] that risk by failing to take reasonable measures to abate it." Farmer, 511 U.S. at 847. Thus, even if a defendant "actually knew of a substantial risk to [detainee] health or safety[, she] may be found free from liability if [she] responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844. "Disregard of the risk is . . . a question of fact that can be shown by standard methods." Goebert, 510 F.3d at 1327 (citation omitted).

Finally, the plaintiff must show that the defendant's conduct constituted more than gross negligence. "The meaning of 'more than gross negligence' is not self-evident." Id. However, case law provides some guidance. Id. Notably, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs." Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1317 (11th Cir. 2010) (citing McElligott v. Foley, 182 F.3d 1248, 1255 (11th Cir. 1999)). Where a plaintiff is harmed by a delay in the provision of medical care, courts consider: "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." Goebert, 510 F.3d at 1327 (citing Hill, 40 F.3d at 1189). However, "accidental inadequacy, negligence in diagnosis

or treatment, [and] medical malpractice" are insufficient to sustain a claim of deliberate indifference. <u>Nimmons v. Aviles</u>, 409 F. App'x 295, 297 (11th Cir. 2011) (per curiam) (quoting <u>Taylor v. Adams</u>, 221 F.3d 1254, 1258 (11th Cir. 2000)).

### iii. Causation

Finally, a plaintiff must show that "the constitutional violation caused the injury." <u>Cottone v. Jenne</u>, 326 F.3d 1352, 1358 (11th Cir. 2003); <u>Goebert</u>, 510 F.3d at 1327. Causation "can be shown by personal participation in the constitutional violation." <u>Goebert</u>, 510 F.3d at 1327 (citing <u>Zatler v. Wainwright</u>, 802 F.2d 397, 401 (11th Cir. 1986) (per curiam)).

### b. Application

Plaintiff alleges that four (4) defendants violated Thompson's Fourteenth Amendment rights through deliberate indifference to Thompson's medical needs. <u>See</u> Dkt. No. 1 ¶¶ 77-82.

### i. Objectively Serious Medical Need

Construing the facts in Plaintiff's favor, Thompson entered the GCDC with bruised or fractured ribs. While at the GCDC, Thompson developed a rash. These conditions were diagnosed and treated by medical personnel. Consequently, these conditions

were objectively serious medical needs.  Goebert, 510 F.3d at 1326 (stating that a medical need satisfies the objective component if it "has been diagnosed by a physician as mandating treatment").

Also while detained, Thompson developed necrotizing tracheobroncitis (i.e., a dying and inflamed airway), pneumonia, and a small pocket of pus in her heart muscle.  Thompson also became septic.  Prior to Thompson's autopsy, there was no clinical diagnosis related to these conditions.  Therefore, Plaintiff had a serious medical need with regards to these conditions only if the need was "so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  Id. (citation omitted).

Plaintiff does not contend that Thompson's medical needs were serious on the day that she was detained.  Specifically, Plaintiff does not question Thompson's care prior to her last visit with Dr. Gunderson on Tuesday, May 12 at 9:30 a.m.  At some time during her detention, however, Thompson lost control of her bowels, began to hallucinate, and vomited repeatedly.  Thompson also became pale and developed blisters inside her mouth.  These facts—taken collectively—would undoubtedly alert a lay person to the necessity of medical attention.  See, e.g.,

Aldridge v. Montgomery, 753 F.2d 970, 972 (11th Cir. 1985)
(finding serious need where one-and-a-half-inch cut over
detainee's eye was allowed to bleed for two and one-half hours
before sutured).  Consequently, Thompson had an objectively
serious medical need when these symptoms manifested.

    *ii. Deliberate Indifference to the Medical Need*

    Whether a particular defendant was subjectively
deliberately indifferent is a unique inquiry as to each
individual.  See Presley, 650 F. Supp. 2d at 1315 (recognizing
that imputed or collective knowledge is insufficient for a claim
of deliberate indifference) (quoting Burnette, 533 F.3d at
1331)).  Each defendant encountered Thompson under different
circumstances.  Consequently, the Court now carefully and
separately analyzes whether Defendants Orr, Brown, Carnette, and
Hollingsworth were deliberately indifferent to Thompson's
medical needs.  See Burnette, 533 F.3d at 1331 ("Each individual
Defendant must be judged separately and on the basis of what
that person [knew].").

        A.   Nurse Orr

    Nurse Orr worked night shifts (from 6:00 p.m. until 6:00
a.m.) on Monday, Tuesday, and Friday.  Dkt. No. 56-60.  Viewing

the facts in the light most favorable to Plaintiff, Nurse Orr's knowledge and actions were as follows:

On Monday at 6:00 p.m., Nurse Orr knew that Inmate Smith suspected that Thompson was withdrawing from drugs. See Dkt. Nos. 55-5, at 39; 56-60; see also supra note 10. By Monday night, Nurse Orr knew that Thompson had rashes on her body, vomited one time, and complained of nausea and of her throat and chest "tightening up." Dkt. Nos. 44-1 ¶ 16; 55-11, at 167; 57 ¶ 16. Nurse Orr also knew that Dr. Gunderson prescribed medication for Thompson's condition and would personally evaluate Thompson Tuesday morning. Dkt. Nos. 44-1 ¶¶ 17, 19; 57 ¶¶ 17, 19.

Because Nurse Orr handed out medications during his evening shifts, Nurse Orr knew that Thompson took multiple medications related to her injured rib and skin rashes.

On Friday at approximately 6:30 p.m., Nurse Orr knew that Thompson was hallucinating, breaking out in hives, vomiting, pale, and in need of medical care. Dkt. No. 55-8, at 48-49. On Friday at 7:00 p.m., Nurse Orr observed Thompson walk unassisted to the medication cart to receive her medications. Dkt. Nos. 56-18; 56-68, at 3. Nurse Orr noted that Thompson was awake and alert. Dkt. No. 56-68, at 3. Also at approximately 7:00 p.m.,

Nurse Orr knew that Thompson had not eaten all week, was not drinking, and was not getting up or doing any activity. Dkt. No. 55-5, at 31-32. Nurse Orr also knew that Inmate Smith had showered Thompson on Friday. Id. at 32.

Sometime Friday evening, Officer Carnette told Nurse Orr that an inmate reported seeing Thompson vomit. Dkt. No. 55-16, at 71-72. Also on Friday evening, Master Sergeant Jones relayed inmates' concerns about Thompson's need for medical attention to Nurse Orr. Dkt. No. 55-3, at 11. On Friday at approximately 8:30 p.m., Nurse Orr knew that Thompson was vomiting and complained of feeling bad. Dkt. Nos. 55-12, at 184; 57 ¶ 28.

On Friday at 8:45 p.m. or 9:10 p.m., Nurse Orr assessed Thompson. Nurse Orr learned that Thompson was nauseous, vomited, felt bad, and was withdrawing from Oxycontin. Dkt. Nos. 55-12, at 184; 56-68, at 3. Nurse Orr checked Thompson's blood pressure and pulse and found them to be within the normal range.[31] Dkt. No. 56-68, at 3; 55-12, at 189. Nurse Orr saw no

---

[31] There is evidence in the record showing that—because Thompson said that she was withdrawing from drugs—Nurse Orr should have measured Thompson's temperature and blood-oxygen level to match Dr. Gunderson's standards. Dkt. No. 55-18, at 67-68, 70. Moreover, Dr. Gunderson stated that Nurse Orr should have called him, even if Thompson's vitals were normal. Id. at 68, 70-71. Dr. Gunderson also suggested that Nurse Orr should have heard

signs or symptoms of distress.  He found Thompson to be awake and alert.  Dkt. Nos. 55-12, at 187-89; 56-68, at 3.  Nurse Orr wrote in Thompson's medical chart that Thompson should follow-up with the doctor the following morning.  Dkt. Nos. 55-12, at 192-93; 56-68, at 3.

On Saturday at approximately 2:20 a.m., Nurse Orr knew about Thompson's lying on Inmate Dixon's mattress.  Dkt. No. 55-16, at 77-78.  He also knew of her hallucinations, assertions that she could not move, and her cooing noises.  Id.  On Saturday at approximately 2:50 a.m., Nurse Orr knew that Thompson was unconscious and unresponsive.

For the purposes of evaluating Defendants' Motion, the Court divides Thompson's medical conditions and Nurse Orr's related and relevant knowledge of those conditions into three (3) segments.  The Court evaluates each segment separately.

  1.  *Friday Morning to Wednesday Morning.*

The first time period spans from the time of Thompson's detention until after Nurse Orr left work at 6:00 a.m. on

---

Thompson's heartbeat, assessed her lung respirations, and examined throat. Id. at 93.

Wednesday morning. Thompson did not have an untreated, objectively serious medical need until she developed rashes on Monday night. See supra Part IV.B.1.b.i. Nurse Orr knew of this medical need and responded appropriately to it. Specifically, he assessed Thompson's condition, called Dr. Gunderson, and complied with Dr. Gunderson's orders. Consequently, Plaintiff does not suggest that Nurse Orr was indifferent to Thompson's medical needs at this time.

Nurse Orr's only other interactions with Thompson during either of his shifts on Monday and Tuesday nights were when he delivered medications to Thompson as part of his routine delivery schedule. Plaintiff does not suggest that Nurse Orr improperly interacted with Thompson on these occasions. Moreover, Plaintiff did not develop any other manifestations of a serious medical need, such as hallucinations and uncontrolled urination and defecation, until sometimes Wednesday.

In summary, Thompson had an objectively serious medical need—rashes—during this first time period. Nurse Orr responded appropriately to this need. Consequently, Nurse Orr is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period.

## 2.   Friday Evening.

The second time period spans from the time that Nurse Orr's shift began at 6:00 p.m. Friday evening until after he last assessed Thompson at approximately 9:10 p.m. on Friday.

From approximately 6:30 p.m. to 8:45 p.m., Nurse Orr learned the following facts:  Thompson had not eaten all week, was not drinking, was not getting up or doing any activity, was hallucinating, broke out in hives, was vomiting, was pale, complained of feeling bad, had been showered by another inmate, and needed medical care.  During his delivery of medications at approximately 6:30 p.m. to 7:00 p.m., Nurse Orr yelled, "[Thompson's] putting on the greatest show[] for y'all in the world.  She's one of the best actors.  Nothing is wrong with this girl."  Dkt. No. 55-8, at 26.  Nurse Orr told an inmate who requested medical care for Thompson that the inmate was not a doctor and that she should let him do his job.  Dkt. No. 55-5, at 32.

At 8:45 p.m. and 9:10 p.m., Nurse Orr visited Thompson in her cell.  Dkt. No. 56-18, at 3.  During one of these visits, Nurse Orr assessed and questioned Thompson.  Thompson said that she was nauseous, vomited, felt bad, and was withdrawing from Oxycontin.  Dkt. Nos. 55-12, at 184; 56-68, at 3.  Nurse Orr

checked Thompson's blood pressure and pulse. Dkt. No. 56-68, at
3. These vital signs were within the normal range. Dkt. No.
55-12, at 189. Nurse Orr found no signs or symptoms of
distress. Dkt. No. 56-68, at 3. He found Thompson to be awake
and alert. Dkt. Nos. 55-12, at 187-89; 56-68, at 3. Nurse Orr
noted in Thompson's medical chart that she should follow-up with
the doctor the following morning. Dkt. Nos. 55-12, at 192-93;
56-68, at 3.

Viewing the facts in the light most favorable to Plaintiff,
Nurse Orr was subjectively aware that Thompson faced a
substantial risk of serious medical harm. First, Nurse Orr knew
of Thompson's serious medical needs. Specifically, Nurse Orr
knew that Thompson was hallucinating, withdrawing from
Oxycontin, pale, vomiting, had hives, complained of feeling bad,
had been showered by another inmate, and needed medical care.
He also knew that Thompson was not eating, drinking, or getting
up to do any activity. Second, the facts drawn in Plaintiff's
favor show that Nurse Orr "dr[ew] the inference" that Thompson
faced a substantial risk of serious harm. Farmer, 511 U.S. at
837. Viewing the facts in Plaintiff's favor, Thompson's medical
needs were serious and obvious. Among other things, she was

vomiting, hallucinating, withdrawing from Oxycontin, had hives, and had not eaten all week. Because the seriousness of Thompson's medical needs was obvious, the Court must conclude——for the purposes of this Order——that Nurse Orr subjectively knew that Thompson faced a substantial risk of serious harm. See Goebert, 510 F.3d at 1327 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." (quoting Farmer, 511 U.S. at 842)).

Because the Court must draw all inferences in Plaintiff's favor, the Court's finding is not altered by Nurse Orr's observations that, at approximately 6:30 p.m., Thompson was awake and alert and walked unassisted to the medication cart to receive her medications. See Dkt. Nos. 56-18; 56-68, at 3. Nor is the Court's finding altered by the fact that Nurse Orr found no signs and symptoms of distress after questioning Thompson and taking her vital signs at approximately 9:00 p.m. See Dkt. Nos. 55-12, at 184, 189; 56-68, at 3, 56-68, at 3. These facts do not erase Nurse Orr's knowledge of Thompson's serious medical needs. Specifically, notwithstanding whether Thompson could walk or answer Nurse Orr's questions, Nurse Orr knew that Thompson faced serious harm because he knew that she was hallucinating, vomiting, and withdrawing from Oxycontin.

Because a factfinder can conclude from these facts that the risks to Thompson were obvious and, thus, Nurse Orr was subjectively aware of them, this Court must do so. See Goebert, 510 F.3d at 1327.

Nurse Orr also disregarded Thompson's serious medical needs. First, he outwardly expressed disregard for Thompson's obvious medical needs when he said, "[Thompson's] putting on the greatest show[] for y'all in the world. She's one of the best actors. Nothing is wrong with this girl." Dkt. No. 55-8, at 26. Second, he provided a cursory assessment that allegedly failed to meet the level of care expected from him. See Dkt. No. 55-18, at 43-48, 66-70. Third, he postponed Thompson's access to medical treatment by failing to call Dr. Gunderson or emergency medical personnel. Dkt. Nos. 55-12, at 192-93; 56-68, at 3. Viewing the evidence in Plaintiff's favor, Nurse Orr failed to take reasonable measures to abate the serious and obvious risks that Thompson faced. Consequently, he disregarded her serious medical needs. See Farmer, 511 U.S. at 847 (noting that the plaintiff must show that the defendant "disregard[ed] th[e] risk [of substantial harm] by failing to take reasonable measures to abate it").

Nurse Orr was more than grossly negligent.  See Goebert,
510 F.3d at 1327 (listing the following factors in evaluating
the defendant's actions or omissions: "(1) the seriousness of
the medical need; (2) whether the delay worsened the medical
condition; and (3) the reason for the delay").  First,
Thompson's medical needs were serious.  Second, delay in
treatment worsened her condition.  See Dkt. No. 57-1 ¶ 97
(providing Dr. Gunderson's opinion that Thompson's survival and
full recovery were "99%" certain if Dr. Gunderson had been made
aware of Thompson's symptoms on Friday evening).  Third, no
reason other than Nurse Orr's disregard for Thompson's medical
treatment caused the delay in Thompson's medical care.  These
facts indicate that Nurse Orr was more than grossly negligent.

Finally, Plaintiff's facts show that Nurse Orr's deliberate
indifference to Thompson's medical needs caused her death.
Specifically, Dr. Gunderson stated that he was "99% sure that
[Thompson] would have survived and recovered fully" if
Dr. Gunderson was made aware of Thompson's symptoms on Friday,
May 15, at 8:30 p.m.  See id.

Viewing the evidence in Plaintiff's favor, (1) Nurse Orr
was subjectively aware that Thompson faced a substantial risk of
serious harm; (2) Nurse Orr was more than grossly negligent in

56

disregarding that risk of harm; and (3) Nurse Orr's actions caused Thompson's injuries. Consequently, Nurse Orr is not entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred Friday evening.

### 3. Saturday Morning.

The third time period spans the brief period from Nurse Orr's notification that Thompson was lying on her cellmate's mattress until EMTs arrived at the GCDC.

At approximately 2:20 a.m. on Saturday, Nurse Orr knew that Thompson was lying on Inmate Dixon's mattress, hallucinating, asserted that she could not move, and made cooing noises. Dkt. No. 55-16, at 77-78. At approximately 2:50 a.m. on Saturday, Nurse Orr was summoned to Thompson's cell where he found her unconscious and unresponsive. Dkt. No. 55-2, at 56. He administered CPR and summoned EMS.

Plaintiff does not suggest that Nurse Orr was indifferent to Thompson's medical needs during this time period. See Dkt. No. 53, at 52-53. The Court agrees. At 2:20 a.m., Sergeant Hollingsworth felt Thompson's pulse and described her breathing as "nice and smooth." Dkt. Nos. 55-2, at 53; 57-1 ¶ 61. Nurse Orr arrived to Thompson's cell within half an hour of Sergeant Hollingsworth and Officer Carnette's first morning visit to

Thompson's cell and within minutes of their second morning visit to her cell. Nurse Orr quickly began administering CPR. He summoned EMS. Nurse Orr's response did not suggest deliberate indifference to Thompson's medical needs. Consequently, Nurse Orr is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period.

### B. Officer Brown

Officer Brown worked the day shift (from 6:00 a.m. until 6:00 p.m.) on Friday, Saturday, and Sunday. Dkt. No. 56-60. Officer Brown worked the night shift (from 6:00 p.m. until 6:00 a.m.) on Thursday. Id. Viewing the facts in the light most favorable to Plaintiff, Officer Brown's knowledge and actions were as follows:

On Saturday, Officer Brown knew that Thompson's rib hurt. Dkt. Nos. 44-1 ¶ 9; 57 ¶ 9. Officer Brown also knew that a nurse gave Thompson Ibuprofen and an ice pack to ease the discomfort. Dkt. Nos. 44-1 ¶ 10; 57 ¶ 10. On Saturday and Sunday, Officer Brown brought Thompson's lunch to her in her cell. Dkt. No. 55-5, at 27.

During each hourly check from 6:00 p.m. Thursday until
6:00 a.m. Friday, Officer Brown found Thompson lying in her bed.
Dkt. No. 57-1 ¶ 46.  On Thursday at 6:00 p.m., Officer Brown
knew that an inmate suspected that Thompson was withdrawing from
drugs.[32]  See Dkt. Nos. 55-5, at 39; 56-60.  At approximately
8:00 p.m., Officer Brown observed Thompson wearing only a shirt
and underwear.  Dkt. Nos. 44-1 ¶ 23; 55-17, at 30-31; 57 ¶ 23.
Officer Brown knew that Thompson was hot.  Dkt. Nos. 44-1 ¶ 24;
57 ¶ 24.  At approximately 9:00 p.m., Officer Brown observed
that Thompson had not covered herself.  Dkt. No. 44-1 ¶ 26.
Thompson told Officer Brown that she felt like she was having a
heat stroke.  Dkt. No. 56-27.  Officer Brown also observed feces
stains on Thompson's underwear.  Dkt. No. 56-27.

On Friday at approximately 6:00 a.m., Officer Brown noticed
that Thompson had soiled herself.  Dkt. No. 55-5, at 16.


For the purposes of evaluating Defendants' Motion, the
Court divides Thompson's medical conditions and Officer Brown's
related and relevant knowledge of those conditions into two (2)
segments.  The Court evaluates each segment separately.

---

[32] See supra note 17.

### 1. Friday Morning to Sunday Evening.

The first time period spans from the time of Thompson's detention until after Officer Brown left work at 6:00 p.m. on Sunday evening. Thompson's only objectively serious medical need during this time period was her rib injury. Thompson received prescription medication, Ibuprofen, and an ice pack as treatment for her injury. Thus, Thompson did not have an untreated, objectively serious medical need during this time period. See supra Part IV.B.1.b.i. Consequently, Officer Brown is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period.

### 2. Thursday Evening to Friday Morning.

The second time period spans from the time that Officer Brown's shift started at 6:00 p.m. Thursday until her shift ended at approximately 6:00 a.m. Friday morning.

By 9:00 p.m. Thursday, Officer Brown knew that Thompson had lain in her bed during each of Officer Brown's hourly rounds and that Thompson was partially dressed, felt like she was having a heat stroke, and had feces stains on her underwear. Officer Brown also knew that an inmate suspected that Thompson was withdrawing from drugs.

By 6:00 a.m. Friday, Officer Brown knew that Thompson had lain in her bed during each of Officer Brown's hourly rounds. Dkt. No. 57-1 ¶ 46. At approximately 6:00 a.m., Officer Brown noticed that Thompson had soiled herself. Dkt. No. 55-5, at 16. Officer Brown ridiculed Thompson for not showering or cleaning herself. Dkt. No. 55-5, at 16-17. Officer Brown stated, "Just because you women come to jail doesn't mean you have to stop being women; you can still take care of yourself." Id.

Assuming for the purposes of this Order that Officer Brown was deliberately indifferent to Thompson's serious medical needs, the record does not show that Officer Brown's inaction caused Thompson's death. Specifically, Dr. Gunderson stated that he was "99% sure that [Thompson] would have survived and recovered fully" if Dr. Gunderson was made aware of Thompson's symptoms on Friday, May 15, at 8:30 p.m. See Dkt. No. 57-1 ¶ 97. Officer Brown's shift ended at 6:00 a.m. Friday morning. GCDC medical personnel saw Thompson multiple times after Officer Brown's shift ended and before 8:30 p.m. Friday night. See supra Part II.B.8. If she had been properly assessed and treated during any of those medical visits, Thompson could still have "recovered fully." See Dkt. No. 57-1 ¶ 97. Thus, Officer Brown's actions did not cause Thompson's death. Consequently,

Officer Brown is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period.

C.   Officer Carnette

Officer Carnette worked night shifts (from 6:00 p.m. until 6:00 a.m.) on Monday and Friday.  Dkt. No. 56-60.  Viewing the facts in the light most favorable to Plaintiff, Officer Carnette's knowledge and actions were as follows:

On Monday at 6:00 p.m., Officer Carnette knew that Thompson had rashes on her body.  Dkt. Nos. 44-1 ¶ 15; 57 ¶ 15.  She also knew that Inmate Smith suspected that Thompson was withdrawing from drugs.  Dkt. No. 55-5, at 39.

On Friday evening, Officer Carnette was told multiple times that Thompson needed medical attention because she had been soiling herself.  Id. at 48.  By 8:30 p.m., Officer Carnette knew that Thompson was vomiting and complained of feeling bad. Dkt. Nos. 55-12, at 184; 55-16, at 71; 57 ¶ 28.  At approximately 11:00 p.m., Officer Carnette saw Thompson in her cell speaking with several inmates.  Dkt. No. 57-1 ¶ 57.

On Saturday at approximately 1:30 a.m., Officer Carnette saw Thompson lying in bed.  Dkt. No. 55-16, at 83.  Shortly

after 2:00 a.m., Officer Carnette saw Thompson lying on Inmate
Dixon's mattress on the floor.  Dkt. No. 57-1 ¶ 59.  Officer
Carnette knew that Thompson said that she could not move, Inmate
Dixon stated that Thompson had not fallen, Inmate Dixon said
that Thompson was hallucinating, and Thompson made "cooing"
noises.  Dkt. Nos. 55-4, at 73-74; 57-1 ¶ 59.  Officer Carnette
observed that Thompson did not appear to be in distress, that
her speech was not slurred, and that she spoke normally.  Dkt.
No. 55-4, at 68, 70.  Shortly before 2:20 a.m., Officer Carnette
knew that Thompson did not respond to Sergeant Hollingsworth's
attempts to talk to her.  Dkt. No. 57-1 ¶¶ 59, 61.  She also
knew that Thompson appeared to be sleeping and that Sergeant
Hollingsworth believed that he felt Thompson's pulse.  Dkt. Nos.
55-2, at 51; 57-1 ¶ 61.

On Saturday at approximately 2:45 a.m., Officer Carnette
saw that Thompson remained on the mattress on the floor.  Dkt.
No. 55-16, at 85.  Officer Carnette knew that Thompson did not
respond to loud noises or attempts to get her attention.  Dkt.
No. 57-1 ¶ 63.


For the purposes of evaluating Defendants' Motion, the
Court divides Thompson's medical conditions and Officer

Carnette's related and relevant knowledge of those conditions into four (4) segments. The Court evaluates each segment separately.

### 1. Friday Morning to Tuesday Morning.

The first time period spans from the time of Thompson's detention until after Officer Carnette left work at 6:00 a.m. on Tuesday morning. Thompson did not have an untreated, objectively serious medical need until she developed rashes on Monday night. See supra Part IV.B.1.b.i. Officer Carnette knew of this medical need and responded appropriately to it. Specifically, she called Nurse Orr to evaluate Thompson's condition. Consequently, Plaintiff does not suggest that Officer Carnette was indifferent to Thompson's medical needs at this time.

In summary, Thompson had an objectively serious medical need—rashes—during this first time period. Officer Carnette responded appropriately to this need. Consequently, Officer Carnette is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period.

*2. Friday Evening.*

The second time period spans from the time that Officer Carnette's shift began at 6:00 p.m. Friday evening until after the inmates were locked down at 11:00 p.m. Friday night.

From approximately 6:30 p.m. to 8:45 p.m., Officer Carnette learned the following facts: Thompson had been soiling herself and vomiting, complained of feeling bad, and needed medical attention. Throughout the evening, Officer Carnette notified medical personnel and Sergeant Jones of Thompson's need for medical attention. At 8:45 p.m., Nurse Orr responded to these requests. By 9:10 p.m., Nurse Orr assessed Thompson's condition. Officer Carnette was present for this assessment. Nurse Orr found no emergent condition and decided that Thompson should be seen by medical personnel the following day. Shortly thereafter, at approximately 11:00 p.m., Officer Carnette knew that Thompson was in her cell speaking with several inmates.

Officer Carnette's actions do not evidence deliberate indifference to Thompson's medical needs. In fact, Officer Carnette repeatedly sought aid for Thompson. She was present when Nurse Orr assessed Thompson around 9:00 p.m. She wrote in the Jail Notes that Nurse Orr found Thompson's vitals to be "good" and that Thompson was placed on the next day's sick call

list.  Dkt. No. 56-61.  Moreover, she saw Thompson talking with other inmates just prior to lockdown at 11:00 p.m.

Plaintiff notes that Officer Carnette told inmates that she could and did notify medical personnel but that she did not have control beyond notifying medical personnel.  See, e.g., Dkt. No. 55-5, at 20, 22, 48-49.  This comment does not evidence an indifference to Thompson's medical needs.  Moreover, Officer Carnette did more than summon medical personnel.  She repeatedly notified medical personnel of Thompson's condition until Nurse Orr ultimately arrived.  She also sought assistance from Master Sergeant Jones when medical assistance was needed. Consequently, even assuming that Officer Carnette drew the inference between Plaintiff's symptoms and the risk of harm, the Court cannot conclude that she failed to act reasonably to such risk of harm.  See Farmer, 511 U.S. at 844 (Even if a defendant "actually knew of a substantial risk to [detainee] health or safety[, she] may be found free from liability if [she] responded reasonably to the risk, even if the harm ultimately was not averted.").

Because Plaintiff has not shown that Officer Carnette acted unreasonably to a substantial risk of serious harm, Officer Carnette is entitled to summary judgment on the deliberate

indifference claims that are based on conduct that occurred Friday evening.

### 3. Saturday Morning from 2:00 to 2:20 a.m.

The third time period spans the brief period from 2:00 a.m. to 2:20 a.m.  Shortly after 2:00 a.m., Officer Carnette saw Thompson lying on Inmate Dixon's mattress on the floor.  Dkt. No. 57-1 ¶ 59.  Officer Carnette knew that Thompson said that she could not move, Inmate Dixon stated that Thompson had not fallen, Inmate Dixon said that Thompson was hallucinating, and Thompson made "cooing" noises.  Dkt. Nos. 55-4, at 73-74; 57-1 ¶ 59.  Officer Carnette observed that Thompson was not in distress, that her speech was not slurred, and that she spoke normally.  Dkt. No. 55-4, at 68, 70.

Plaintiff has not shown that Officer Carnette was subjectively aware of Thompson's serious medical need.  Specifically, Plaintiff has not shown that Officer Carnette "dr[ew] the inference" from Thompson's presence on Inmate Dixon's mattress that a substantial risk of serious harm existed.  Farmer, 511 U.S. at 837.  It is insufficient to show that Officer Carnette should have perceived the risk of serious harm.  Presley, 650 F. Supp. 2d at 1315 (citing Burnette, 533 F.3d 1325).  Rather, Plaintiff must show that Officer Carnette

<u>actually</u> perceived it.  <u>See</u> <u>id.</u>  It is here that Plaintiff's evidence fails.

Inmate Dixon stated that Thompson did not fall onto Dixon's mattress.  Furthermore, Officer Carnette——perhaps wrongly—— believed that Thompson could return to her own bed if she so desired.  <u>See</u> Dkt. No. 55-16, at 67-68, 70.  Thus, the facts show that Officer Carnette misunderstood Thompson's actions. Officer Carnette stated that——after questioning Thompson about her presence on Inmate Dixon's mattress——she summoned Sergeant Hollingsworth because she was unsure of how to deal with one inmate trying to sleep with another inmate.  <u>See</u> Dkt. No. 55-2, at 49.

Moreover, Officer Carnette responded to Thompson's condition.  Specifically, Officer Carnette secured Sergeant Hollingsworth's help.  Such action does not suggest a disregard of Thompson's condition.  Although Thompson did not respond to Sergeant Hollingsworth's attempts to talk to her shortly before 2:20 a.m., Officer Carnette knew that Thompson appeared to be sleeping and that Sergeant Hollingsworth believed that he felt Thompson's pulse.  Dkt. Nos. 55-2, at 51; 57-1 ¶¶ 59, 61.  An inmate sleeping at 2:20 a.m. is not an objectively serious medical need.  Moreover, Officer Carnette knew that Sergeant

Hollingsworth found that Thompson had a pulse, was breathing, and appeared to be sleeping.  She also knew that she and Sergeant Hollingsworth notified Nurse Orr about Thompson's condition, including her hallucinations, assertions that she could not move, and her cooing noises.  Dkt. No. 55-16, at 77-78.  Leaving Thompson asleep in her room after seeking a second opinion and notifying medical personnel does not suggest disregard to an inmate's medical need.

Because Plaintiff has not shown that Officer Carnette drew the inference that Thompson had a serious medical need or acted unreasonably to a substantial risk of serious harm, Officer Carnette is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period.

### 4.  *Saturday Morning at 2:45 a.m.*

The fourth time period spans the brief period from 2:45 a.m. until EMTs arrived at the GCDC.

After finding Thompson unresponsive at approximately 2:45 a.m., Officer Carnette summoned Sergeant Hollingsworth and Nurse Orr.  Dkt. No. 57-1 ¶ 63.  Within a few minutes, Officer Carnette, Sergeant Hollingsworth, and Nurse Orr returned to

Thompson's cell.  Dkt. No. 55-16, at 88.  They administered CPR and summoned EMS.

Officer Carnette's actions to immediately summon medical help when she found Thompson unconscious and unresponsive do not evidence a disregard to Thompson's medical need.  To the contrary, Officer Carnette's actions evidence a desire to immediately provide medical care.  Consequently, Officer Carnette is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period.

D.   Sergeant Hollingsworth

Sergeant Hollingsworth's involvement with Thompson was extremely limited.  Viewing the facts in the light most favorable to Plaintiff, Sergeant Hollingsworth's knowledge and actions were as follows:

Shortly before 2:20 a.m. on Saturday, Sergeant Hollingsworth knew that Thompson was lying on Inmate Dixon's bed with her forehead under the lower bunk.  Dkt. No. 57-1 ¶¶ 59, 61.  Sergeant Hollingsworth knew that Thompson did not respond to his attempts to talk to her.  Id. ¶ 61.  He thought that Thompson had a pulse, knew that she did not feel cold, heard her

breathing and snoring, and believed that she was sleeping.  Dkt.
Nos. 55-2, at 51-53; 57-1 ¶ 61.  At approximately 2:20 a.m.,
Sergeant Hollingsworth closed Thompson's cell door and heard a
louder response from Thompson as he did so.  Dkt. No. 55-2, at
52, 54.  He instructed Officer Carnette to check on Thompson in
a "few minutes."  Id. at 52.  Sergeant Hollingsworth also knew
that he and Officer Carnette notified Nurse Orr about Thompson's
condition, including her hallucinations, assertions that she
could not move, and her cooing noises.[33]  Dkt. No. 55-16, at 77-
78.

At approximately 2:50 a.m., Sergeant Hollingsworth found no
pulse in Thompson's neck and noticed that she was cold, pale,
and not breathing.  Dkt. No. 55-16, at 56.


For the purposes of evaluating Defendants' Motion, the
Court divides Thompson's medical condition and Sergeant
Hollingsworth's related and relevant knowledge of that condition

---

[33] Plaintiff asserts that Officer Carnette and Sergeant Hollingsworth notified
Nurse Orr of Thompson's condition after 2:30 a.m.  See Dkt. No. 57-1 ¶ 63
(citing Dkt. No. 55-16).  However, the evidence shows that Nurse Orr was
notified prior to 2:30 a.m.  See Dkt. No. 55-16, at 71-78 (referring to
Carnette's 2:21 a.m. visit to Thompson's cell).

into two (2) segments.  The Court evaluates each segment separately.

### 1.  *Saturday Morning from 2:00 to 2:20 a.m.*

The first time period spans the brief period after Sergeant Hollingsworth was notified, shortly before Saturday at 2:20 a.m., that Thompson was lying on her cellmate's mattress until Sergeant Hollingsworth left Thompson's cell at approximately 2:20 a.m.

Shortly before 2:20 a.m., Officer Carnette summoned Sergeant Hollingsworth to help resolve the issue of Thompson lying on Inmate Dixon's mattress.  Dkt. No. 57-1 ¶ 59.  As he entered C-Pod, Sergeant Hollingsworth said to C-pod in general, "What kind of show is [Thompson] putting on for you guys tonight?"  Dkt. No. 55-10, at 28.  This comment, insensitive as it was, does not evidence disregard to Thompson's serious medical need.  In fact, there is no evidence that Sergeant Hollingsworth had any knowledge of any of Thompson's medical symptoms prior to entering C-Pod.

When he reached Thompson's cell, Sergeant Hollingsworth saw Thompson lying on Inmate Dixon's mattress on the floor.  Dkt. No. 57-1 ¶ 59.  Sergeant Hollingsworth tried to talk to Thompson

three (3) times.  Thompson did not respond.  Id. ¶ 61.  She
appeared to be sleeping.  Dkt. No. 55-2, at 51.

Sergeant Hollingsworth touched Thompson between her face
and neck, thought that he felt a pulse, and noted that she did
not feel cold.  Dkt. No. 57-1 ¶ 61.  Sergeant Hollingsworth
heard Thompson breathing and snoring.  Dkt. No. 55-2, at 52-53.
He described Thompson's breathing as "nice and smooth."  Id. at
53.

Plaintiff has not shown that Sergeant Hollingsworth was
subjectively aware of Thompson's serious medical need.
Specifically, Plaintiff has not shown that Sergeant
Hollingsworth "dr[ew] the inference" from Thompson's presence on
Inmate Dixon's mattress that a substantial risk of serious harm
existed.  See Farmer, 511 U.S. at 837.  Nor has Plaintiff has
shown that Sergeant Hollingsworth "dr[ew] the inference" from
Thompson's sleeping through his questions that a substantial
risk of serious harm existed.  See id.

Sergeant Hollingsworth knew less about Thompson's condition
than Officer Carnette.  Moreover, he responded to Officer
Carnette's request for assistance, ensured that Thompson had a
pulse, noted that her breathing seemed normal, and decided that
she was sleeping.  At best, Plaintiff's evidence shows that

Sergeant Hollingsworth misunderstood the seriousness of
Thompson's condition.  Plaintiff's evidence does not show that
he drew an inference that Thompson faced a substantial risk of
serious harm if she was left to sleep in her cell.  Moreover,
Sergeant Hollingsworth went a step further by ensuring that
medical personnel were notified of Thompson's condition.  He
also instructed Officer Carnette to check on Thompson in a "few
minutes."  Dkt. No. 55-2, at 52.  Leaving Thompson asleep in her
room after notifying medical personnel does not suggest
disregard to an inmate's medical need.

Prior to leaving Thompson's cell, Sergeant Hollingsworth
removed Inmate Dixon from the cell.  Dkt. Nos. 55-4, at 85-86;
57-1 ¶ 62.  In response to Inmate Medlin's offer to sleep in
Thompson's cell so that Thompson was not alone, Sergeant
Hollingsworth said that there was "nothing wrong with
[Thompson]" and that "she was putting on a good show."  Dkt. No.
55-6, at 20-21.  These remarks——when viewed in the context of
Sergeant Hollingsworth's contemporaneous assessment of
Thompson's condition——do not suggest a disregard of a serious
medical need.  Furthermore, after making his remarks, Sergeant
Hollingsworth notified GCDC medical personnel of Thompson's

condition and instructed Officer Carnette to check on Thompson in a few minutes.

At approximately 2:20 a.m., the Sergeant Hollingsworth and Officer Carnette closed Thompson's cell door. Dkt. Nos. 55-2, at 52, 54; 56-18, at 4. Sergeant Hollingsworth heard a louder response from Thompson as the door closed. Dkt. No. 55-2, at 52, 54. The evidence does not show that this response——even viewed in combination with other facts known by Sergeant Hollingsworth——put him on notice that Thompson faced a serious medical need. Furthermore, Sergeant Hollingsworth notified GCDC medical personnel of Thompson's condition after he heard Thompson's response.

Because Plaintiff has not shown that Sergeant Hollingsworth drew the inference that Thompson had a serious medical need or acted unreasonably to a substantial risk of serious harm, Sergeant Hollingsworth is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period.

### 2. Saturday Morning at 2:50 a.m.

The second time period spans the brief period from 2:50 a.m. Saturday until EMTs arrived at the GCDC.

At approximately 2:50 a.m., Officer Carnette told Sergeant Hollingsworth that Thompson was unconscious and unresponsive. Dkt. No. 57-1 ¶ 63. Within a few minutes, Officer Carnette, Sergeant Hollingsworth, and Nurse Orr returned to Thompson's cell. Dkt. No. 55-16, at 88. Sergeant Hollingsworth found Thompson pale, cold, not breathing, and without a pulse. Dkt. No. 55-2, at 56. He and Nurse Orr administered CPR and summoned EMS.

Sergeant Hollingsworth's actions to help Officer Carnette summon medical help when Thompson was unconscious and unresponsive do not evidence a disregard to Thompson's medical need. To the contrary, Sergeant Hollingsworth's actions evidence a desire to immediately provide medical care. Consequently, Sergeant Hollingsworth is entitled to summary judgment on the deliberate indifference claims that are based on conduct that occurred during this time period.

    c. Conclusion

Because Defendants Brown, Carnette, and Hollingsworth were not deliberately indifferent to Thompson's serious medical needs, they are entitled to summary judgment on Count 7.

Nurse Orr was not deliberately indifferent to Thompson's serious medical needs before his shift began Friday evening or during his encounters with Thompson Saturday morning. Consequently, he is entitled to summary judgment on Count 7 during those time periods. However, a fact issue remains as to Nurse Orr's alleged deliberate indifference on the evening of Friday, May 15, 2009. Consequently, Nurse Orr is entitled not to summary judgment on Count 7 during that time period.

2. Qualified Immunity

Defendants assert that they are entitled to qualified immunity. Specifically, Defendants assert that their actions were discretionary and did not violate clearly established law. Dkt. No. 44, at 24-25. Given the analysis above, Plaintiff's claims are now limited to one defendant, Nurse Orr. Furthermore, Plaintiff's claims are limited to Nurse Orr's conduct on the evening of Friday, May 15. The Court now assesses whether Defendant Orr is entitled qualified immunity on Plaintiff's remaining deliberate indifference claim.

a. Legal Standard

The qualified immunity defense "protect[s] government officials from liability for civil damages." Youmans v. Gagnon, 626 F.3d 557, 562 (11th Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223 (2009) (internal punctuation omitted)). Finding that an official was deliberately indifferent to a detainee's serious medical needs does not necessarily preclude qualified immunity. Bozeman v. Orum, 422 F.3d 1265, 1273-74 (11th Cir. 2005). Therefore, Defendant Orr retains his entitlement to qualified immunity "unless the law preexisting [his] supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in [his] place would be on notice that what [he] was doing would be clearly unlawful given the circumstances." Id. at 1273 (quoting Pace v. Capobianco, 283 F.3d 1275, 1282 (11th Cir. 2002)).

The Eleventh Circuit established a burden-shifting framework within which to analyze a defendant's qualified immunity defense. First, "a defendant official must . . . show that his allegedly wrongful act or omission occurred while he was engaged in a discretionary duty." Goebert, 510 F.3d at 1329 (citing Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005)). Assuming that the defendant was engaged in a

discretionary duty, the plaintiff must establish "both that the defendant committed a constitutional violation and that the law governing the circumstances was already clearly established at the time of the violation." Youmans, 626 F.3d at 562 (quoting Pearson, 555 U.S. 223).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987) (citations omitted). This does not mean that an official receives qualified immunity for all actions that have not previously been held to be unlawful. McMillian v. Johnson, 88 F.3d 1554, 1565 (11th Cir. 1996), vacated and amended on other grounds, 101 F.3d 1363 (11th Cir. 1996); Anderson, 483 U.S. at 640. However, the unlawfulness of the action must be "apparent" in the light of pre-existing law. McMillian, 88 F.3d at 1565 ("[F]or the law to be clearly established, a court need not have found the very action in question unlawful; what is essential is that the action's unlawfulness be apparent in light of pre-existing law.").

The Court looks to three (3) sources of law to determine whether the law was sufficiently well-established: "specific

statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." Goebert, 510 F.3d at 1330 (citing Hope v. Pelzer, 536 U.S. 730, 741 (2007)).

In assessing the merits of a qualified immunity defense in deliberate indifference cases, the Court conducts an objective, albeit fact-specific, inquiry. Harris v. Coweta Cnty., 21 F.3d 388, 390 (11th Cir. 1994) (citing Anderson, 483 U.S. at 641). The Court "review[s] the record through the eyes of an objective, reasonable [officer]." Id. (citing Nicholson v. Georgia Dep't of Human Res., 918 F.2d 145, 147 (11th Cir. 1990)).

b. Application

It is undisputed that all of Nurse Orr's relevant conduct occurred within the scope of his authority and pursuant to his duties as a GCDC LPN. Furthermore, Nurse Orr's decisions regarding whether to provide Thompson with medical care and whether to call Dr. Gunderson or other medical professionals were arguably discretionary. See, e.g., Goebert, 510 F.3d at 1329-31 (applying qualified immunity analysis to detention

facility commander's decision not to provide medical care to a detainee); but see supra Part V.B.2.b (noting that factual issue exists as to whether Nurse Orr's decisions were discretionary). Therefore, for the purposes of this Order, Nurse Orr has met his burden to "show that his allegedly wrongful act or omission occurred while he was engaged in a discretionary duty." Id. at 1329.

Moreover, the Court has already established that Plaintiff has set forth an actionable constitutional violation by Nurse Orr. See supra Part IV.B. Therefore, the only remaining question for the Court is whether "the law governing the circumstances was already clearly established at the time of the violation." Youmans, 626 F.3d at 562 (citing Pearson, 555 U.S. 223). Consequently, the Court considers whether it would have been apparent to a reasonable jail LPN in Nurse Orr's position that Nurse Orr's conduct constituted deliberate indifference to Plaintiff's medical needs. Because the test is objective, the Court must not look to what Nurse Orr actually thought or intended. Instead, the Court must consider what a reasonable LPN would think given what Nurse Orr knew at the time and the relevant circumstances in which Nurse Orr found himself. See Harris, 21 F.3d at 390-91. More specifically, the question

before the Court is whether, in May 2009, the law sufficiently established that a twelve (12) to fifteen (15) hour delay in treating a person who is hallucinating, withdrawing from Oxycontin, pale, vomiting, has hives, complains of feeling bad, and has not been eating, drinking, or getting up to do any activity was a constitutional violation, such that a reasonable LPN would have known not to delay seeking medical care.

At the time of Thompson's detention, it was clearly established that knowledge of the need for medical care and intentional refusal to provide that care constituted deliberate indifference.  See, e.g., Harris, 21 F.3d at 393 (refusing to give necessary diagnostic test); Carswell v. Bay Cnty., 854 F.2d 454 (11th Cir. 1988) (possessing knowledge of inmate's deteriorating condition and significant weight loss yet delaying medical treatment).  Delay in treatment of serious injuries was also clearly recognized as rising to the level of a constitutional claim.  See, e.g., Harris, 21 F.3d at 393 (delaying diagnostic test until prisoner is transferred to separate prison to save detention center resources); Brown v. Hughes, 894 F.2d 1533 (11th Cir. 1990) (per curiam) (failing to summon medical aid for visibly swollen and sore foot).

However, to be established with the required particularity, the pre-existing law must give officials some sense of what amount of time constitutes actionable delay. <u>Harris</u>, 21 F.3d at 393. By May 2009, the law did so.

"The tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay." <u>Id.</u> at 393-94. "A few hours' delay in receiving medical care for emergency needs . . . may constitute deliberate indifference." <u>Id.</u> at 394 (citing as example <u>Brown</u>, 894 F.2d at 1533 (eleven hour delay to evaluate broken foot)). Moreover, "[d]elayed treatment for injuries . . . that are obvious serious medical needs[] may also give rise to constitutional claims." <u>Id.</u> at 393 (citation omitted). For these kinds of serious injuries, such as hallucinating, vomiting, and withdrawing from Oxycontin, the law was clearly established that nearly half a day was too long to fail to properly respond to the medical need. <u>See, e.g.</u>, <u>Harper v. Lawrence Cnty., Ala.</u>, 592 F.3d 1227, 1234 (11th Cir. 2010) (noting that detainee's alleged symptoms, including hallucinations, slurred speech, physical weakness, and incoherence, were sufficient to show deliberate indifference and survive motion to dismiss); <u>Fielder v. Bosshard</u>, 590 F.2d 105

(11th Cir. 1979) (holding that less than three day delay between detainee's booking and his death with continuous symptoms of illness constituted deliberate indifference); <u>Howard v. City of Columbus</u>, 521 S.E.2d 51, 59 (Ga. Ct. App. 1999) (refusing to find jailers were entitled to qualified immunity where they failed to respond to signs of obvious medical problems including overheating, craving of water, dizziness, constipation, fainting, and visible weight loss).

Finally, in May 2009, it was clear that deliberate indifference could be inferred from an unexplained delay in treating a known or obvious serious medical condition. <u>Goebert</u>, 510 F.3d at 1331; <u>Harris</u>, 21 F.3d 388; <u>Brown</u>, 894 F.2d at 1538 ("When prison guards ignore without explanation a prisoner's serious medical condition that is known or obvious to them, the trier of fact may infer deliberate indifference." (citing cases)).

Consequently, the contours of unreasonable delay in providing treatment for serious medical needs were defined with enough particularity to allow a reasonable LPN with Nurse Orr's knowledge of Thompson's symptoms to understand whether his actions were lawful. Under the clearly established legal norms, a reasonable LPN would have known that delaying access to

medical care for a serious medical need for nearly half a day for a nonmedical reason may violate a detainee's constitutional rights. Therefore, the Court holds that, in May 2009, a reasonable LPN in Nurse Orr's position would have known that delaying the provision of medical care to a detainee with Thompson's symptoms (e.g., hallucinating, withdrawing from Oxycontin, pale, vomiting, covered in hives, complaining of feeling bad, and not eating, drinking, or getting up to do any activity) violated her constitutional rights. Consequently, Nurse Orr is not entitled to summary judgment based on qualified immunity.

C. PUNITIVE DAMAGES

    In Count 8, Plaintiff seeks punitive damages against the individually-named Defendants in their individual capacities. Dkt. No. 1 ¶¶ 83-85. Defendants seek summary judgment on Plaintiff's claim. Dkt. No. 44-2.

    As noted above, Defendants Bennett, Brown, Carnette, and Hollingsworth are entitled to summary judgment on all federal claims against them. An underlying substantive claim is a prerequisite to any request for punitive damages. Accord Mann v. Taser Intern, Inc., 588 F.3d 1291, 1304 (11th Cir. 2009) ("A

punitive damages claim is derivative of a plaintiff's tort claim, and where a court has dismissed a plaintiff's underlying tort claim, dismissal of a plaintiff's punitive damages claim is also required."). Consequently, Defendants Bennett, Brown, Carnette, and Hollingsworth's request for summary judgment on Count 8 is **GRANTED**.

As noted in Part IV.B., Nurse Orr is entitled to partial summary judgment on Count 7. To the extent that Nurse Orr is entitled to summary judgment on Count 7, he is also entitled to summary judgment on Count 8. Specifically, Nurse Orr's request for summary judgment on Count 8 is **GRANTED** for any request for punitive damages for Nurse Orr's actions that occurred before Friday, May 15 or on Saturday, May 16, 2009. Nurse Orr's request for summary judgment on Count 8 is **DENIED** for his alleged actions that occurred on Friday, May 15, 2009.

D. <u>ATTORNEY'S FEES</u>

In Count 4, Plaintiff seeks attorney's fees pursuant to 42 U.S.C. § 1988. Dkt. No. 1 ¶¶ 63-64. Defendants seek summary judgment on Plaintiff's claim. Dkt. No. 44-2, at 27.

Attorney's fees are available under § 1988 only if a plaintiff prevails on her § 1983 claim. 42 U.S.C. § 1988.

Because the County and Defendants Bennett, Brown, Carnette, and Hollingsworth are entitled to summary judgment on Plaintiff's § 1983 claims (Counts 1 and 7) (see supra Parts IV.A-B), the County and Defendants Bennett, Brown, Carnette, and Hollingsworth are entitled to summary judgment on Count 4. Consequently, the County and Defendants Bennett, Brown, Carnette, and Hollingsworth's request for summary judgment on Count 4 is **GRANTED**.

Nurse Orr's request for summary judgment on Count 4 is **DENIED** for his alleged actions that on Friday, May 15, 2009. For all other time periods, Nurse Orr's request for summary judgment on Count 4 is **GRANTED**.

## V. STATE LAW CLAIMS

### A. Sovereign Immunity (for Defendants Glynn County and Sheriff Bennett in his Official Capacity)

In Count 2, Plaintiff brings a state law claim against Defendant Glynn County and Defendant Sheriff Bennett in his official capacity.[34]  See Dkt. No. 1 ¶¶ 50-54.  Specifically,

---

[34] The Court addresses Plaintiff's claim against Defendant Bennett in his individual capacity in Part V.B.2.a.

Plaintiff alleges that Glynn County violated Georgia statutes that required it to provide medical care to Thompson. For the reasons stated below, Glynn County and Defendant Bennett in his official capacity are entitled to sovereign immunity under Georgia law. See Dkt. No. 44-2, at 27-29. Consequently, Defendants' request for summary judgment with respect to Count 2 is **GRANTED**.

1. Legal Standard

Count 2 is asserted against Glynn County and Sheriff Bennett in his official capacity. It is undisputed that Sheriff Bennett was a municipal officer, working for Glynn County as Sheriff, at the time of the relevant events. A suit against a municipal officer in his official capacity is functionally equivalent to a direct suit against the county. See Strength v. Lovett, 714 S.E.2d 723, 726 (Ga. Ct. App. 2011) ("A lawsuit against a sheriff in his official capacity is considered a suit against the county, and the sheriff is entitled to assert any defense or immunity that the county could assert, including sovereign immunity."). Therefore, the claims against Sheriff Bennett in his official capacity are superfluous. Consequently,

the Court's analysis addresses whether Plaintiff has established a claim against Defendant Glynn County.

In Georgia, a "county is not liable for any cause of action unless made so by statute." O.C.G.A. § 36-1-4. Implied waivers of immunity are disfavored. See <u>Gish v. Thomas</u>, 691 S.E.2d 900, 907 (Ga. Ct. App. 2010).

2. Application

Plaintiff asserted claims against Glynn County under O.C.G.A. §§ 42-4-4, 42-4-32, 42-4-50, 42-4-51, and 42-5-2. <u>See</u> Dkt. No. 1 ¶¶ 50-54. Georgia statutes do not waive sovereign immunity with respect to any of these provisions. Moreover, implied waivers of immunity are disfavored. Therefore, sovereign immunity bars any claims brought pursuant to these statutory provisions. <u>See</u> <u>Gish</u>, 691 S.E.2d at 908 (referring specifically to O.C.G.A. § 42-5-2). Plaintiff agrees "except to the extent that the Sheriff's immunity is waived due to his bond." <u>See</u> Dkt. No. 53, at 70-71.

O.C.G.A. § 15-16-5 provides that "sheriffs shall give a bond in the sum of $25,000.00 . . . conditioned for the faithful accounting for all public and other funds or property coming into the sheriffs' or their deputies' custody, control, care, or

89

possession." Pursuant to O.C.G.A. § 15-16-5, Sheriff Bennett posted bond. The posting of that bond "waived sovereign and official immunity for acts and omissions that come under the bond coverage." Cantrell v. Thurman, 499 S.E.2d 416, 421 (Ga. Ct. App. 1998); see O.C.G.A. § 50-21-1 ("The defense of sovereign immunity is waived as to any action ex contractu for the breach of any written contract . . . entered into by . . . state authorities.").

The conduct underlying the claims asserted against Sheriff Bennett in his official capacity does not fall within the bond's coverage. See Adams v. Carlisle, 630 S.E.2d 529, 549 (Ga. Ct. App. 2006) (Phipps, J., concurring in the judgment). Specifically, Plaintiff's claims concern Thompson's care while in GCDC custody. However, the sheriff's bond is for "faithful accounting for all public and other funds or property." O.C.G.A. § 15-16-5. Because the Plaintiff's claims do not come under the bond coverage, the bond did not waive Sheriff Bennett's sovereign immunity. Consequently, Sheriff Bennett in his official capacity and Glynn County are entitled to summary judgment on Count 2.

B. <u>Official Immunity (for Sheriff Bennett and Nurse Orr in Their</u>
   <u>Individual Capacities)</u>

In Counts 2, 3, and 6, Plaintiff asserts state law claims
against Sheriff Bennett and Nurse Orr in their individual
capacities. <u>See</u> Dkt. No. 1 ¶¶ 50-62, 71-76. Defendants seek
summary judgment on these claims, arguing, among other things,
that Sheriff Bennett and Nurse Orr are entitled to official
immunity under Georgia law. Dkt. Nos. 44-2, at 29-35; 75, at
21-25. For the reasons stated below, Sheriff Bennett is
entitled to official immunity. Consequently, Defendants'
request for summary judgment with respect to Counts 2 and 3 is
**GRANTED**. Nurse Orr is not entitled to official immunity.
Consequently, Defendants' request for summary judgment with
respect to Count 6 is **DENIED**.

   1.  Legal Standard

Official immunity protects county officers and employees
from certain state-law claims. Official immunity protects
officials where the claim arises out of the official's
performance of a discretionary function. It does not protect
officials who "negligently perform or fail to perform their
ministerial functions." <u>Peterson v. Baker</u>, 504 F.3d 1331, 1339

(11th Cir. 2007) (citing <u>Gilbert v. Richardson</u>, 452 S.E.2d 476,

483 (Ga. 1994)).  Moreover, it does not protect officials who

"act with actual malice or intent to cause injury in the

performance of their official functions."  <u>Id.</u> (citing <u>Gilbert</u>,

452 S.E.2d at 483).

"A discretionary act . . . calls for the exercise of

personal deliberation and judgment, which in turn entails

examining the facts, reaching reasoned conclusions, and acting

on them in a way not specifically directed."  <u>Teston v. Collins</u>,

459 S.E.2d 452, 454 (Ga. Ct. App. 1995).  A ministerial act is

"simple, absolute, and definite."  <u>Grammens v. Dollar</u>, 697

S.E.2d 775, 777-78 (Ga. 2010).  It must be executed "without any

exercise of discretion."  <u>Id.</u> at 778.

Actual malice denotes "express malice or malice in fact"

meaning "badness[] [or] a true desire to do something wrong."

<u>Peterson</u>, 504 F.3d at 1339 (citing <u>Adams v. Hazelwood</u>, 520

S.E.2d 896, 898 (Ga. 1999).  It "requires a deliberate intention

to do wrong."  <u>Id.</u> (citing <u>Adams</u>, 520 S.E.2d at 898.  Actual

malice is more than "reckless disregard for human life."  <u>Merrow</u>

<u>v. Hawkins</u>, 467 S.E.2d 336, 338 (Ga. 1996).

"[A] county has legislative duty to provide an inmate in

its custody and care with medical care."  <u>Middlebrooks v. Bibb</u>

92

Cnty., 582 S.E.2d 539, 542 (Ga. Ct. App. 2003) (citing O.C.G.A. §§ 42-5-2(a); 42-4-4(a)(2); 42-4-32(d)). Because "the right to medical care is a fundamental right, it is not discretionary." Thus, "the violation of such right 'is not subject to either sovereign immunity or official immunity.'" Id. at 542-43 (quoting Cantrell v. Thurman, 499 S.E.2d 416, 421 (Ga. Ct. App. 1998); Howard v. City of Columbus, 521 S.E.2d 51, 66 (Ga. Ct. App. 1999) (en banc)). However, "the determination of what medical treatment to provide is an act of discretion subject to official immunity." Howard, 521 S.E.2d at 66 (quoting Cantrell, 499 S.E.2d at 421).

2. Application

a. Sheriff Bennett

In Count 2, Plaintiff asserts that Sheriff Bennett breached his duties to provide detainees with needed medical services and hospital care (O.G.C.A. §§ 42-4-4, 42-4-51, 42-5-2) and to observe detainees daily and ensure that a physician is "immediately called if there are indications of serious injury, wound, or illness" (O.G.C.A. § 42-4-32). Dkt. No. 1 ¶¶ 52-54. In Count 3, Plaintiff reasserts that Sheriff Bennett violated state law by failing to provide necessary medical assistance and

93

hospital care.  Id. ¶¶ 56-58.  Plaintiff further asserts that Sheriff Bennett purposely failed to adequately train and supervise subordinates who were in charge of medical care.  Id. ¶ 60.  Plaintiff also asserts that Sheriff Bennett negligently supervised GCDC personnel with respect to the provision of detainees' medical care.  Id. ¶ 61.

A sheriff's decisions regarding training, supervision, and health-care policies are discretionary.  Middlebrooks, 582 S.E.2d at 543; see also Youngs v. Johnson, No. 4:06-CV-19(CDL), 2008 WL 4816731, at *12 (M.D. Ga. Oct. 30, 2008) ("Georgia law clearly provides that the determination of what medical treatment to provide is an act of discretion subject to official immunity." (citing Schmidt v. Adams, 438 S.E.2d 659, 660-61 (Ga. Ct. App. 1993) and Schulze v. DeKalb Cnty., 496 S.E.2d 273, 276 (Ga. Ct. App. 1998))).

Plaintiff cites Howard v. City of Columbus, 521 S.E.2d 51 (1999) (en banc), for the proposition that Sheriff Bennett's actions were ministerial rather than discretionary.  The court in Howard produced a fractured opinion with two (2) judges concurring only in the judgment and three (3) judges dissenting from the relevant portion of the opinion.  Furthermore, the court in Howard acknowledged that the provision of medical care

was a required, ministerial act whereas the determination of what medical treatment to provide was a discretionary act. Howard, 521 S.E.2d at 66. Thus, the parties, this Court, and the Howard court agree that there is a distinction between, on the one hand, the requirements that the sheriff provide medical care and train officers to provide that care and, on the other hand, the sheriff's decisions regarding how to train his officers to assess a detainee's condition and regarding how and when to summon medical personnel.

This result is consistent with Georgia case law. See, e.g., Graham v. Cobb Cnty., 730 S.E.2d 439, 444 (Ga. Ct. App. 2012) ("Because the determination of how to provide adequate medical care to the prisoners at the jail involved the use of discretion by [the sheriff], and because [the plaintiff] has failed to allege any facts that establish that [the sheriff] acted with wilfulness, malice, or corruption, the trial court correctly determined that [the sheriff is] shielded from personal liability by official immunity."); Harvey v. Nichols, 581 S.E.2d 272, 276 (Ga. Ct. App. 2003) ("The [plaintiffs] maintain that [the sheriff] was negligent in carrying out his responsibilities with respect to the operation of the jail, the supervision of its officers and employees, and the establishment

of policies and procedures. Any decisions with regard to these responsibilities 'clearly would be made by [the sheriff] based on his examination of the facts, his experience, and the exercise of his best judgment. The acts complained of are thus "discretionary" and fall within the scope of [the sheriff's] official immunity.'" (quoting Schmidt, 438 S.E.2d 659)); Middlebrooks, 582 S.E.2d at 543-44 ("The operation of a police department, including the degree of training and supervision to be provided its officers, is a discretionary governmental function of the county as opposed to a ministerial, proprietary, or administratively routine function." (citation omitted)).

Because Sheriff Bennett's actions were discretionary, he is entitled to summary judgment on Plaintiff's state law claims unless he acted with "actual malice or intent to cause injury." See Peterson, 504 F.3d at 1339. Plaintiff presented no evidence that Sheriff Bennett acted with actual malice or an intent to cause injury. There is no evidence that Sheriff Bennett knew Thompson or interacted with her. Furthermore, there is no evidence that Sheriff Bennett's training or policies were intended to cause harm. Sheriff Bennett's statements that inmates are dishonest and that he was not running a medical facility are insufficient to establish a genuine issue of

material fact regarding actual malice.  See id. (holding that derogatory comments were inadequate to establish an issue of fact).  Consequently, Sheriff Bennett is entitled official immunity on all of Plaintiff's state law claims against him.  As such, Sheriff Bennett's request for summary judgment as to Counts 2 and 3 is **GRANTED**.

b. Nurse Orr

In Count 6, Plaintiff asserts that Nurse Orr's reliance on his own evaluation of Thompson caused her death.  Dkt. No. 1 ¶ 74.  Plaintiff further asserts that Nurse Orr's care was "grossly deficient and violated the standard of care for licensed practical nurses."  Id. ¶ 75.

"[T]he determination of what medical treatment to provide is an act of discretion subject to official immunity." Cantrell, 499 S.E.2d at 421 (emphasis omitted); see also Youngs, 2008 WL 4816731, *12 ("Georgia law clearly provides that the determination of what medical treatment to provide is an act of discretion subject to official immunity.").  Furthermore, the negligent diagnosis and treatment of an inmate's medical condition is protected under official immunity.  See Schmidt, 438 S.E.2d at 660-61.  However, an LPN's "refusal or delay in

administering medical care . . . when [a plaintiff's] condition exceed[s] the protocol mandating [such medical care does] not require the exercise of discretion" and is, therefore, a ministerial function. Howard, 521 S.E.2d at 51, 68 (denying official immunity where LPNs deliberately ignored the pleas of a diabetic inmate, his cellmates, and deputies either to summon a doctor or to transport the inmate to the hospital).

There is a question of fact as to whether GCDC policy required Nurse Orr to notify Dr. Gunderson each time that Nurse Orr assessed a detainee. There is also a question of fact as to whether GCDC policy required Nurse Orr to take four (4) vital signs and notify Dr. Gunderson if a detainee stated that she was withdrawing from drugs. Compare Dkt. No. 53, at 76; 55-18, at 67-68, 70-71, 84-88 (suggesting that officers should call Dr. Gunderson if there is "anything abnormal" or if there is "any question" regarding a detainee's condition); supra note 31, with Dkt. No. 57-1 ¶ 105 (noting that Dr. Gunderson did not set jail policy). Construing the facts in Plaintiff's favor, such policies existed, and Nurse Orr did not abide by them. Consequently, Nurse Orr's actions were ministerial, not discretionary.

Viewing the facts in Plaintiff's favor, Nurse Orr either "negligently perform[ed] or fail[ed] to perform [his] ministerial function[]" when he failed to take four (4) vital signs and failed to contact Dr. Gunderson.  See Peterson v. Baker, 504 F.3d 1331, 1339 (11th Cir. 2007) (citation omitted).  Consequently, Nurse Orr is not entitled to summary judgment based on official immunity.

## VI.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.  Dkt. No. 44.

Defendants' motion for summary judgment on Counts 1, 2, and 3 is **GRANTED**.[35]  Defendants' motion for summary judgment on Count 6 is **DENIED**.  Defendants' motion for summary judgment on Counts 4, 7, and 8 is **GRANTED** with respect to all Defendants other than Nurse Orr.  Consequently, Defendants Glynn County, Bennett, Brown, Carnette, and Hollingsworth are **DISMISSED** from the case.

---

[35] The Court granted summary judgment on Count 5 in a prior Order.  See Dkt. No. 76.

Defendant Orr's motion for summary judgment on Count 6 is **DENIED**. Furthermore, Defendant Orr's motion for summary judgment on Counts 4, 7, and 8 is **GRANTED IN PART** and **DENIED IN PART**. Specifically, Defendant Orr's motion for summary judgment on Counts 4, 7, and 8 is **GRANTED** for Nurse Orr's alleged actions that occurred either before Friday, May 15 or on Saturday, May 16, 2009. Defendant Orr's motion for summary judgment on Counts 4, 7, and 8 is **DENIED** for his alleged actions that occurred from the time that he started his shift at approximately 6:00 p.m. Friday, May 15, 2009, until he last assessed Thompson at approximately 9:10 p.m. on Friday, May 15, 2009.

The Clerk of Court is instructed to enter an appropriate judgment.

**SO ORDERED**, this 29th day of March, 2013.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA